SHULER v MICHIGAN PHYSICIANS MUTUAL LIABILITY COMPANY
LAKE STATES INSURANCE COMPANY v SHULER
LAKE STATES INSURANCE COMPANY v SCHNEIDER

Docket Nos. 239291, 239471, 239472. Submitted October 21, 2003, at Lansing. Decided February 10, 2004, at 9:05 A.M. Leave to appeal sought.

Dorothy D. Shuler, other former patients of Marion D. Sutton, M.D., and the husbands of some of those patients, brought an action in the Midland Circuit Court against Michigan Physicians Mutual Liability Company (MPMLC), the medical malpractice insurer of Dr. Sutton, seeking a declaratory judgment that MPMLC must indemnify Sutton and his professional corporations, Mid-Michigan Family Physicians, P.C., and Marion David Sutton, M.D., P.C., against claims related to Dr. Sutton's touching of the patients' clitorises during pelvic examinations. Dr. Sutton, Mid-Michigan Family Physicians, P.C., and Peggy S. and Ronald G. Schneider intervened as plaintiffs. Peggy Schneider, who had been a patient and an employee of Dr. Sutton, also complained of the same improper touching. MPMLC counterclaimed for a declaratory judgment in its favor, arguing that the plaintiffs' action is barred by res judicata because in a prior action it had obtained a declaratory judgment in its favor on the question of coverage, and because coverage is excluded by the criminal acts provision in the policy and Dr. Sutton had sustained convictions of criminal sexual conduct either after being tried or after pleading no contest. MPMLC moved for summary disposition.

Lake States Insurance Company, which insured Dr. Sutton and Mid-Michigan Family Physicians, P.C., under a business owners policy, brought an action in the same court against the former patients and the husbands of some of those patients, Dr. Sutton, and his professional corporations, seeking a declaratory judgment that it did not have to provide coverage for the claims of the patients and the husbands of some of those patients, including Mrs. Schneider's additional claim of negligent hiring and supervision by Mid-Michigan Family Physicians, P.C. Lake States moved for summary disposition, and Mrs. Schneider moved for summary disposition. The court, Paul J. Clulo, J., consolidated the cases for hearing and decision on the motions. The court denied Lake States' motion con-

cerning coverage for Mrs. Schneider's claim of negligent hiring and supervision by Mid-Michigan Family Physicians, P.C., and granted her cross-motion for summary disposition, concluding that negligent hiring and supervision could be characterized as an occurrence under the policy, Mrs. Schneider had alleged physical ailments that qualify as bodily injury under the terms of the policy, and that the claim did not arise out of rendering or failing to render a professional service and, therefore, was not excluded from coverage. With respect to MPMLC's motion, the court denied it in part, ruling that res judicata was not a bar for plaintiffs other than Mrs. Schneider because Dr. Sutton withdrew the guilty pleas underlying the prior declaratory judgment and thereafter was convicted on pleas of no contest, thus leaving genuine issues of fact concerning whether those plaintiffs' claims are subject to the criminal acts exclusion of the policy. The court granted MPMLC's motion with respect to Mrs. Schneider's claim, ruling that the jury's conviction of Dr. Sutton was conclusive on the question of criminal activity by Dr. Sutton. A jury thereafter determined that Dr. Sutton had not engaged in a criminal act with respect to the patients other than Mrs. Schneider. The court entered a declaratory judgment based on the verdict and granted further relief to the plaintiffs in the form of a $600,000 money judgment, representing the policy limit. MPMLC's motion for a new trial was denied by the court. MPMLC appealed, Mrs. Schneider cross-appealed, and Lake States appealed. The appeals were consolidated.

The Court of Appeals *held*:

1. The trial court abused its discretion by prohibiting MPMLC from impeaching Dr. Sutton's credibility with evidence of his conviction of attempted perjury relating to inconsistency between his testimony in one of the criminal sexual conduct trials and the statements he made in the proceeding in which he pleaded guilty. Dr. Sutton pleaded no contest to the charge of attempted perjury. A conviction that ordinarily could be used for impeachment purposes is not excluded from that use because the conviction resulted from a plea of no contest. The conviction of attempted perjury falls within the class of crimes that contain an element of dishonesty or false statement that are available for impeachment use pursuant to MRE 609(a)(1). The trial court erroneously engaged in the balancing test of MRE 609(b) or MRE 403 to exclude the conviction because of its prejudicial effect. Despite the improper exclusion of evidence of the conviction of attempted perjury, reversal is not needed because the jury, through Dr. Sutton's testimony, learned that he pleaded guilty to criminal sexual charges and that he later testified that he did not commit those crimes.

2. The trial court did not abuse its discretion in excluding from evidence the complaints filed by the plaintiffs in their initial suits against Dr. Sutton. Those suits were never tried and MPMLC sought to introduce the complaints to establish that the plaintiffs had alleged intentional touching by Dr. Sutton. The trial court appropriately relied on principles underlying alternative pleading inasmuch as the plaintiffs had alleged in their initial suits that Dr. Sutton had acted either intentionally or in a grossly negligent manner. A party should not be placed in the position of having to forgo a claim at the risk of having inconsistent allegations treated as admissions.

3. The trial court did not abuse its discretion by overruling MPMLC's hearsay objection and permitting Dr. Sutton to testify about the impressions he formed from his attorney's statements concerning the plea-taking and sentencing process. The impressions Dr. Sutton drew from his attorney's statements are analytically distinguishable from the statements themselves.

4. The trial court did not abuse its discretion by excluding from the evidence the written settlement agreements the patients reached with Dr. Sutton and his professional corporations before the patients brought their action against MPMLC. The trial court correctly determined that the written settlement agreements could have confused the jury, and that the existence of an agreement between the patients and Dr. Sutton had already been conceded at trial.

5. MPMLC failed to demonstrate abuse of discretion by the trial court in permitting Dr. Sutton's counsel to ask leading questions of him and the plaintiffs.

6. The trial court did not abuse its discretion in denying MPMLC's motion for a new trial on the asserted ground that the verdict was against the great weight of the evidence. Dr. Sutton offered explanations for his conduct and his decisions to enter guilty pleas or no-contest pleas in his criminal cases. Although his testimony and that of the patients was impeached at trial, it was not deprived of all probative value from the jury's perspective.

7. The trial court did not abuse its discretion by granting the patients a money judgment as further relief based on the declaratory judgment. MCR 2.605(F). The money judgment was based on the settlement agreements between the patients and Dr. Sutton. MPMLC had an opportunity to participate in those settlement negotiations but chose not to do so. The patients' complaint also put MPMLC on notice that they would be seeking enforcement of the settlement agreements in their action for declaratory judgment, MPMLC raised no objections, and MPMLC did not move to strike the request

for money damages or try to have the issue of damages decided by the jury.

8. The judgment interest in this case should be adjusted to reflect amendments of MCL 600.6013 that took effect during the pendency of these appeals. This case falls within the category of cases described in MCL 600.6013(6). The patients filed their action between January 1, 1987, and July 1, 2002; the action did not result in a final, nonappealable judgment as of July 1, 2002; and judgment was rendered on a written instrument, i.e., an insurance policy.

9. Mrs. Schneider's contention that MPMLC waived all defenses other than the criminal acts exclusion by not asserting them when it initially denied coverage is without merit. While defenses based on the policy must be asserted when denying coverage in order not to waive them, the defenses MPMLC later raised, such as res judicata, were not based on the policy and therefore were not waived.

10. The trial court did not err in granting summary disposition for MPMLC on Mrs. Schneider's claim. Dr. Sutton's conviction by a jury for criminal sexual conduct constituted conclusive evidence of criminal activity by Dr. Sutton, thus making Mrs. Schneider's claim subject to the criminal acts exclusion in the policy.

11. Mrs. Schneider alleged a second claim with respect to Dr. Sutton's removal of her bra during a bronchial examination. Because it is not clear from the trial court's ruling whether that claim, which did not result in criminal prosecution, was considered, a remand is necessary for a determination whether the criminal acts exclusion applies to that claim.

12. The trial court erred by granting Mrs. Schneider summary disposition regarding coverage for her claim of negligent hiring and supervision by Mid-Michigan Family Physicians, P.C. Coverage is excluded under the policy because the claim arose out of rendering or failing to render professional services, the policy expressly excludes coverage for bodily injury or property damage arising from the rendering or failure to render professional services, and the policy defines professional services to include supervisory services. On remand, the trial court must enter an order of summary disposition for Lake States on Mrs. Schneider's claim of negligent hiring and supervision.

Affirmed in part, reversed in part, and remanded.

1. WITNESSES — IMPEACHMENT — PRIOR CONVICTIONS — NO-CONTEST PLEAS.

A conviction that ordinarily could be used for impeachment purposes is not excluded from that use because the conviction resulted from a plea of no contest (MRE 410, 609).

2. Pleading — Inconsistent Claims — Evidence.

    Alternative allegations in a complaint may not be treated as admissions by the plaintiff.

3. Motions and Orders — New Trial — Conflicting Testimony.

    Conflicting testimony in a jury trial, even when testimony supporting the verdict has been impeached, is an insufficient ground for granting a new trial.

4. Insurance — Claims — Defenses — Waiver.

    An insurer waives defenses based on the policy if it does not assert them when first denying coverage.

*Mathieu & Lee* (by *James H. Mathieu*) for Dorothy D. Shuler and others.

*Sinas, Dramis, Brake, Boughton & McIntyre, P.C.* (by *Kenneth G. McIntyre*), for Marion D. Sutton, M.D., and Mid-Michigan Family Physicians, P.C.

*Amos E. Williams, P.C.* (by *Thomas E. Kuhn* and *Amos E. Williams*), for Peggy S. and Ronald G. Schneider.

*Fraser Trebilcock Davis & Dunlap, P.C.* (by *Mark A. Bush* and *Graham K. Crabtree*), for Michigan Physicians Mutual Liability Company.

*Smith Haughey Rice & Roegge* (by *Jon D. Vander Ploeg*) for Lake States Insurance Company.

Before: Smolenski, P.J., and Murphy and Wilder, JJ.

Wilder, J. The suits in these consolidated cases arise out of allegations that in the late 1980s and early 1990s, Dr. Marion David Sutton committed criminal sexual conduct (csc) against several of his patients, including Peggy Schneider (also Dr. Sutton's former employee), Nina Shepherd, Kallie Geiling, Margaret Mayes, and Dorothy Shuler, by inappropriately touching each patient's clitoris during pelvic examinations.

Upon consideration of the various issues raised, we affirm in part, reverse in part, and remand to the trial court.

## I. FACTS AND PROCEEDINGS

### A. CRIMINAL PROCEEDINGS

In February 1992, the Midland County Prosecuting Attorney charged Dr. Sutton with two counts of second-degree CSC based on the accusations made by Schneider and a patient who is not a party to these proceedings. In April 1992, the prosecuting attorney charged Dr. Sutton (in a separate complaint) with five counts of second-degree CSC and one count of fourth-degree CSC arising out of claims made by a number of other patients.

After severing the charges in the first complaint, the trial court conducted a jury trial on the complaint concerning the nonparty patient's accusations. The jury convicted Dr. Sutton of second-degree CSC as charged. In October 1992, immediately before sentencing Dr. Sutton, the trial court met with counsel for the parties and requested that Dr. Sutton plead guilty to the remaining charges in exchange for a delayed sentence without additional time in jail. Dr. Sutton accepted that offer and pleaded guilty of committing second-degree CSC against Schneider, Shepherd, Geiling, and Shuler, and pleaded guilty of committing fourth-degree CSC against an additional patient who is not a party to these proceedings. Before entering his pleas, Dr. Sutton stated that that he could not admit having a conscious awareness of touching his patients with a sexual intent, although he stated that he intentionally touched each patient's clitoris without a medical purpose. The trial court sentenced Dr.

Sutton to five years' probation and one year in jail, subject to review in six months, for his jury trial conviction. Thereafter, the trial court imposed a delayed sentence for the charges to which Dr. Sutton pleaded guilty during the October 1992 sentencing hearing. On appeal, this Court vacated Dr. Sutton's sentence because it was disproportionately lenient. *People v Sutton*, unpublished opinion per curiam of the Court of Appeals, issued October 26, 1994 (Docket No. 171214).

Following remand, the trial court granted Dr. Sutton's motion to withdraw the guilty pleas he entered in October 1992. Thereafter, in 1995, the trial court conducted a jury trial concerning the charge based on Schneider's allegation regarding a 1990 pelvic examination by Dr. Sutton. Although the jury acquitted Dr. Sutton of second-degree CSC, it convicted him of fourth-degree CSC. Subsequently, in March 1996, Dr. Sutton pleaded no contest to fourth-degree CSC in the cases concerning Geiling, Shuler, Shepherd, and another patient. In addition to the charges arising directly out of the sexual assaults, Dr. Sutton pleaded no contest to a charge of attempted perjury in exchange for dismissal of a perjury charge based on the inconsistency between his trial testimony and his statements at the October 1992 plea proceeding. Dr. Sutton served his sentence for these convictions and was released in August 1997.

### B. CIVIL PROCEEDINGS

#### 1. SUITS FILED BY SCHNEIDER AND THE PLAINTIFF-PATIENTS

In 1992, in separate yet nearly identical complaints, Shuler, Shepherd, Geiling, and Mayes (the plaintiff-patients) sued Dr. Sutton and his professional corpo-

rations, M. David Sutton, M.D., P.C., and Mid-Michigan Family Physicians, P.C., for assault and battery or criminal sexual conduct, medical malpractice, and breach of contract.[1] The same year, Schneider filed an action alleging (1) gross negligence, sexual harassment, hostile work environment sexual harassment, assault and battery, and medical malpractice against Dr. Sutton, (2) negligent hiring and supervision against Mid-Michigan Family Physicians, P.C., and M. David Sutton, M.D., P.C., and (3) intentional and negligent infliction of emotional distress against Dr. Sutton, M. David Sutton, M.D., P.C., and Mid-Michigan Family Physicians, P.C.[2]

### 2. DECLARATORY RELIEF REQUESTED BY MICHIGAN PHYSICIANS MUTUAL LIABILITY COMPANY

After becoming aware of the suits against its insureds in 1992, Michigan Physicians Mutual Liability Company (MPMLC), Dr. Sutton's malpractice insurer, refused to defend or indemnify Dr. Sutton and Mid-Michigan Family Physicians, P.C., because of the "criminal acts" exclusion in the insurance policy. The exclusion provides that coverage is not provided for "any liability as a consequence of the performance of a criminal or fraudulent act by the Insured, whether or not such an act was performed in conjunction with the rendering or failure to render professional ser-

---

[1] Additionally, Brian Shuler, Francis Mayes, and James Geiling each filed a claim of loss of consortium.

[2] Ronald Schneider also filed a claim of loss of consortium. Although Peggy Schneider was Dr. Sutton's patient, she was also his employee. Throughout the rest of this opinion, the term "plaintiff-patients" refers only to Shuler, Shepherd, Geiling, and Mayes. Moreover, because the loss of consortium claims filed by the patients' husbands are derivative in nature, references to married plaintiffs (i.e., Peggy and Ronald Schneider) are stated in the singular throughout this opinion.

vices." On the basis of this exclusion, MPMLC filed a complaint seeking a declaratory judgment that it did not need to defend or indemnify Dr. Sutton or Mid-Michigan Family Physicians, P.C. MPMLC also named Shuler, the first patient to file suit, as a defendant in the declaratory action.

In 1993, the trial court granted MPMLC's motion for summary disposition pursuant to MCR 2.116(C)(10), concluding that none of Shuler's theories of liability was covered by the policy in light of Dr. Sutton's guilty pleas to charges involving Shuler. Thus, the trial court held that MPMLC had no duty to indemnify or defend Dr. Sutton or Mid-Michigan Family Physicians, P.C., in Shuler's suit.

### 3. SETTLEMENT REACHED BY THE PLAINTIFF-PATIENTS

In June 1998, after Dr. Sutton had completed his sentences in the criminal matters, the plaintiff-patients entered into settlement agreements with Dr. Sutton and his professional corporations, settling their civil claims for $500,000 for each person or couple. Each agreement was subject to Dr. Sutton and his corporations (1) assigning the plaintiff-patients their rights under insurance policies issued by four insurance companies; (2) requiring the plaintiff-patients to pursue declaratory relief against the insurance companies; and (3) permitting the plaintiff-patients to refile their suits if their efforts to collect from the insurers were unsuccessful.

### 4. DECLARATORY RELIEF REQUESTED BY LAKE STATES INSURANCE COMPANY

In April 1998, three of the four insurers named in the settlement agreements, Lake States Insurance

Company (Lake States), TIG, and Aetna (succeeded in interest by Travelers Property & Casualty Company), sought declaratory judgments stating that they did not have to provide coverage for the suits by Schneider and the plaintiff-patients arising from Dr. Sutton's actions. Lake States' suit against Schneider is the only one of these declaratory actions relevant on appeal (Docket Nos. 239471 and 239472).[3] Lake States, which insured Dr. Sutton and Mid-Michigan Family Physicians, P.C., under a Special Business Owners Policy, asserted in its complaint that under the terms of the policy (1) Schneider did not suffer a "personal injury," (2) her injuries did not result from an "occurrence," and (3) coverage did not extend to the injuries because (a) they were expected or intended by the insureds, (b) they arose out of Schneider's employment with the insureds, (c) they arose out of rendering or a failure to render treatment or professional services, (d) they arose out of the willful violation of a penal statute, and (e) Dr. Sutton was not an "insured" under the policy.

5. DECLARATORY RELIEF REQUESTED BY THE PLAINTIFF-PATIENTS

In August 1998, the plaintiff-patients filed a suit for declaratory relief against MPMLC and TIG, requesting a declaratory judgment that MPMLC and TIG, alternatively or together, were required to indemnify their insureds, and a money judgment in favor of each plaintiff-patient consistent with the settlement agree-

---

[3] Lake States filed appeals from the trial court's decisions regarding lower court number 98-007874-CK, its case against the plaintiff-patients (Docket No. 239471), and lower court number 98-007872-CK, its case against Schneider (Docket No. 239472). Although the caption of its brief on appeal references both docket numbers, Lake States' arguments address the trial court's decision regarding Schneider only.

ments, plus interest, costs, and attorney fees. In its affirmative defenses, MPMLC asserted that the plaintiff-patients' claims were barred by res judicata and the prior decision that MPMLC did not have to provide coverage. Additionally, MPMLC stated that the criminal acts exclusion in its policy excluded these claims from coverage. MPMLC also filed a counterclaim requesting a declaratory judgment concerning the criminal acts exclusion and the binding nature of the prior declaratory judgment in its favor. The trial court permitted Dr. Sutton, Mid-Michigan Family Physicians, P.C., and Schneider to intervene as plaintiffs in this matter, following a stipulation by the parties.

### 6. MOTIONS FOR SUMMARY DISPOSITION FILED BY THE INSURERS AND SCHNEIDER

The insurers in both declaratory actions filed motions for summary disposition pursuant to MCR 2.116(C)(8) and (10)[4] and Schneider moved for summary disposition pursuant to MCR 2.116(C)(10) against Lake States only. The trial court consolidated these cases for hearing and decision on the various motions. Following oral arguments, the trial court issued a written opinion in which it granted the motions filed by TIG and Aetna for reasons not relevant on appeal.

Additionally, the trial court denied Lake States' motion concerning coverage for Schneider's claim of negligent hiring and supervision against Mid-Michigan Family Physicians, P.C.,[5] and granted her cross-

---

[4] Presumably, Lake States intended to file pursuant to MCR 2.116(C)(9), failure to state a valid defense, rather than C(8), failure to state a claim.

[5] Schneider admits this is the only count of her complaint to which the Lake States policy applied.

motion for summary disposition, concluding that (1) negligent hiring and supervision could be characterized as an occurrence under the policy, (2) Schneider had alleged physical ailments that qualify as "bodily injury" under the terms of the policy, and (3) it was irrelevant whether Dr. Sutton was an insured under the policy because Schneider's claim pertained to Mid-Michigan Family Physicians' negligence. The trial court also stated that Schneider's claims against Mid-Michigan Family Physicians, P.C., did not arise out of rendering or failing to render a professional service and, therefore, were not excluded from coverage.

The trial court denied MPMLC's motion for summary disposition in part, deciding that res judicata did not bar the plaintiff-patients' suits because Dr. Sutton withdrew the guilty pleas underlying the prior declaratory judgment after the declaratory judgment had been entered. Additionally, the trial court stated that because Dr. Sutton pleaded no contest to the criminal charges,[6] a genuine issue of material fact existed regarding whether his actions constituted criminal acts excluded from coverage. The trial court granted MPMLC's motion regarding Schneider's claims, however, stating that no genuine issue of material fact existed because a jury convicted Dr. Sutton of fourth-degree CSC based on Schneider's allegations.

### 7. TRIAL CONDUCTED IN THE PLAINTIFF-PATIENTS' SUIT AGAINST MPMLC

At trial, Shepherd testified that, on Shuler's recommendation, she visited Dr. Sutton's office for a physi-

---

[6] The trial court did not mention the fact that Dr. Sutton was not charged with any crime based on Mayes's allegations.

cal and pelvic examination in November 1990, during her pregnancy.[7] While Dr. Sutton conducted the pelvic examination, she felt him "flip[] his hand upward and tilt[] it in" as though he was feeling for something, and then felt his thumb moving back and forth against her clitoris. She believed that he did not intentionally touch her clitoris and did not have any indication that he was sexually aroused.

She further testified that despite this incident, she continued to treat with Dr. Sutton, and Dr. Sutton did not stimulate her clitoris during any subsequent examinations. On one occasion, however, he hugged her while she sat on the examining table with only a paper sheet covering her and later kissed her after she got dressed. However, she had no knowledge that he had engaged in any of this behavior for a sexual purpose.

Shuler testified that she started treating with Dr. Sutton in 1988. She estimated that Dr. Sutton performed approximately eight pelvic examinations on her. During three nonconsecutive examinations, she felt Dr. Sutton touch her clitoris for a period of perhaps ten to thirty seconds. She did not say anything to Dr. Sutton about his conduct. He did not say anything to her of a sexual nature during the examinations, and she did not know whether he touched her clitoris intentionally or accidentally.

Shuler testified that when she heard that other women complained about Dr. Sutton, she wondered whether the contact she experienced was not accidental, and she and Shepherd decided to contact a

---

[7] Later testimony revealed that at the time Shuler referred Shepherd to Dr. Sutton, Shuler had already been inappropriately touched by Dr. Sutton during three examinations.

police detective concerning their experiences. She felt a duty to the other complaining women to assist them by providing testimony during the criminal trials recounting what had happened to her. She would not have referred Shepherd to a doctor she believed was intentionally touching her inappropriately.

Geiling testified that she began treating with Dr. Sutton in 1989. In November 1990, Dr. Sutton rubbed her clitoris while performing a pelvic examination. Dr. Sutton did not say anything to her of a sexual nature during the examination, and she had no reason to believe that he touched her for a sexual purpose or was sexually aroused during the examination. At some point after the incident, Geiling told her sister that Dr. Sutton had done something that no doctor should do, that she felt "very raped," and that she was not going back to Dr. Sutton. She stated that she did not undergo any pelvic examinations from 1990 until 1998 because she did not want to be in that situation again and has not treated with Dr. Sutton since that incident. After she learned that other women had reported similar experiences, she felt a need to support the women making the complaints.

Mayes testified that Dr. Sutton examined her in December 1990, after Shepherd referred her to him. She intended to undergo only a routine physical, having lost a significant amount of weight in a short time, but Dr. Sutton decided to perform a pelvic examination and take a pap smear as well. During the pelvic examination, Dr. Sutton touched her clitoris for "just a matter of a few seconds." He did not say anything to her of a sexually suggestive nature during the examination. When she asked him whether she was underweight, he put his hands on her waist and told

her she looked just right. She did not treat with him thereafter.

Dr. Sutton testified that while performing bimanual pelvic examinations, he attempts to avoid touching the patient's clitoris, although the thumb of one hand is positioned near the clitoris while he uses the first two fingers of that hand to examine the patient internally. He also testified that he cut a tendon in his left pinky finger in 1977 and subsequently injured it beyond repair while delivering a baby. Scarring caused the finger to "contracture" down. Then, in September 1989, he tore ligaments in the ring finger of the same hand and subsequently reinjured it twice in 1990. For the 1½ years this injury was healing, conducting bimanual pelvic examinations became uncomfortable and, at times, he was only able to use his right hand to conduct the entire examination. If, after he suffered this injury, any patient had complained that he touched her clitoris during an examination, he would have attempted to explain that his hand was sore and, if concerned it might happen again, he would have stopped conducting pelvic examinations.

Dr. Sutton recalled treating Shepherd on November 13, 1990, and examining her internally to assess the bones of her pelvis to ensure that her baby would not have difficulty moving through her birth canal. This examination involves pressing very deeply with the fingers inside to try to reach the backbone of the pelvis and then moving those fingers side to side to feel the mid-pelvis bones. He stated that he did not recall stimulating her clitoris at any point during the examination. Dr. Sutton testified that on the day he hugged and kissed Shepherd, she was emotionally distraught,

and he was suddenly "caught up in the emotion of the moment."

Dr. Sutton testified that he performed a pelvic examination on Shuler during her first prenatal visit in January 1989. He had no memory of touching her clitoris during this examination or her October 1990 pelvic examination, but did not deny that he may have touched it. Dr. Sutton testified that because Shuler suffered an anal fissure during the delivery of one of her children, he tried to avoid applying pressure to the tissues near her anus, which meant he had to apply more pressure in the front, increasing the chance of contact with the clitoris.

Dr. Sutton also did not recall touching Geiling's clitoris during her pelvic examinations. Because Geiling complained that she had pain during intercourse, Dr. Sutton examined her more fully to try to find the source of her pain. Although Dr. Sutton did not have any medical records for Mayes, he testified that he would have insisted on conducting a full examination in light of her recent weight loss, given that it could be a sign of ovarian cancer. He testified that he did not do anything for his own sexual gratification during any examination and did not attempt to induce sexual arousal in his patients.

After deliberating, the jury concluded that Dr. Sutton had not engaged in a criminal act with respect to any of the plaintiff-patients.

8. POSTTRIAL MOTIONS FILED BY THE PARTIES

On July 19, 2001, the trial court heard the plaintiff-patients' motion for entry of judgment. The plaintiff-patients requested a collective judgment of $600,000,

representing the limit of Dr. Sutton's insurance policy, plus prejudgment interest. Over MPMLC's objection, the trial court concluded that pursuant to MCR 2.605(F), which permits the court to enter "[f]urther necessary or proper relief" in addition to a declaratory judgment, the plaintiff-patients could request further relief in the form of a money judgment. Accordingly, the trial court indicated that it would enter a declaratory judgment based on the jury verdict and permit the plaintiff-patients to file a motion for further relief. MPMLC opposed the plaintiff-patients' subsequent motion, but the trial court stated that MPMLC had waived its right to contest the fairness of the settlement amount, having failed to accept requests that it participate in the settlement negotiations, object to the request for a money judgment in the pleadings, or indicate that the jury needed to consider any issue other than the existence of criminal acts. Accordingly, the trial court granted the plaintiff-patients' request for further relief.

After the trial court entered the judgment, MPMLC moved for a new trial on the basis of MCR 2.611, arguing that the trial court abused its discretion regarding several evidentiary issues at trial. MPMLC also argued that that the jury's verdict was against the great weight of the evidence. The trial court denied the motion on each of the grounds raised. The trial court did, however, grant MPMLC's motion for a stay of execution or enforcement of the judgments pending appeal. This appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews the trial court's decision to admit or exclude evidence for abuse of discretion.

*People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001), citing *People v Starr*, 457 Mich 490, 494; 577 NW2d 673 (1998).

> An abuse of discretion is found only if an unprejudiced person, considering the facts on which the trial court acted, would say that there was no excuse for the ruling made. *People v Snider*, 239 Mich App 393, 419; 608 NW2d 502 (2000). A decision on a close evidentiary question ordinarily cannot be an abuse of discretion. *People v Sabin (After Remand)*, 463 Mich 43, 67; 614 NW2d 888 (2000). [*Aldrich, supra* at 113.]

However, when the resolution of a preliminary question of law determines the admissibility of the evidence, this Court's review is de novo. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). A trial court abuses its discretion if it admits evidence that is inadmissible as a matter of law. *Id.*

This Court also reviews for abuse of discretion the trial court's decision to permit the use of leading questions, *In re Susser Estate*, 254 Mich App 232, 239; 657 NW2d 147 (2002), the trial court's denial of a motion for new trial, *Campbell v Sullins*, 257 Mich App 179, 193; 667 NW2d 887 (2003), and the trial court's decision to grant or deny declaratory relief, *Allstate Ins Co v Hayes*, 442 Mich 56, 75; 499 NW2d 743 (1993).

We review questions of statutory interpretation de novo. *People v Schaub*, 254 Mich App 110, 114-115; 656 NW2d 824 (2002). Likewise, this Court reviews a trial court's decision on a motion for summary disposition de novo. *Ditmore v Michalik*, 244 Mich App 569, 574; 625 NW2d 462 (2001), citing *Van v Zahorik*, 460 Mich 320, 326; 597 NW2d 15 (1999).

Whether res judicata bars a claim is also a question of law subject to review de novo. *Ditmore, supra* at 574.

### III. ANALYSIS

#### A. MPMLC'S APPEAL[8]

MPMLC first argues that the trial court abused its discretion by prohibiting MPMLC from impeaching Dr. Sutton's credibility with his conviction of attempted perjury. We agree.

As mentioned above, the prosecution charged Dr. Sutton with perjury as a result of the inconsistencies between his trial testimony and the statements he made while pleading guilty on October 16, 1992. Dr. Sutton pleaded no contest to one count of attempted perjury in exchange for dismissal of the perjury charges. In granting the plaintiff-patients' motion to exclude evidence of this conviction, the trial court perceived a conflict between MRE 410, which prohibits admission of evidence of a plea of nolo contendere "except . . . in a civil proceeding to support a defense against a claim asserted by the person who entered the plea," and MRE 609, which permits impeachment of a witness's credibility with proof of a conviction of a crime involving "an element of dishonesty or false statement." Ultimately, the trial court decided that MRE 410 "trumped" application of MRE 609 and

---

[8] In each of its arguments concerning the admission or exclusion of evidence, MPMLC asserts that the trial court denied its right to a fair trial. Other than a brief conclusory statement in each section of its brief, however, MPMLC devotes no argument to and provides no support for this assertion. Accordingly, this argument has been abandoned. *Flint City Council v Michigan*, 253 Mich App 378, 393 n 2; 653 NW2d 604 (2002), citing *Davenport v Grosse Pointe Farms Bd of Zoning Appeals*, 210 Mich App 400, 405; 534 NW2d 143 (1995).

excluded the evidence. The trial court stated that even if that were not the case, it still would have excluded the evidence because the danger of unfair prejudice substantially outweighed the probative value of the attempted perjury conviction.

The trial court erred, however, in deciding that MRE 609 and MRE 410 conflict. MRE 410 excludes evidence of a *plea* of no contest, while MRE 609 permits use of certain *convictions* for impeachment purposes, regardless of whether the specific conviction followed a guilty plea, a no-contest plea, or a not-guilty plea.[9] Although no published opinion of this Court or our Supreme Court addresses the intersection of these two rules, we agree with the federal courts of appeal that have determined, after construing federal rules that are nearly identical in all relevant respects, that a conviction that ordinarily could be used for impeachment purposes is not excluded from that use because the conviction resulted from a plea of no contest. See *Brewer v City of Napa*, 210 F3d 1093, 1096 (CA 9, 2000), citing *United States v*

---

[9] Although the parties seem unaware of this distinction, on some level, the trial court seemed to recognize the difference. When framing the issue before it, the trial court stated that it was reviewing the "possible 609 use of the convictions on a nolo conviction—nolo plea based conviction on the perjury charges." After reaching its decision and learning from MPMLC that, if allowed, it would have used the stipulation of fact for the no-contest plea and the judgment of sentence to prove the conviction, the trial court stated:

> I must tell you . . . that you would not have used that stipulation in a 609 case. You would have had the fact that he had, by his plea, been convicted of perjury, but it's a nolo plea. That stipulation of fact that was used to establish the basis, I don't think I would have allowed. . . .

The trial court's ruling, however, does not reflect its awareness of this distinction.

*Williams*, 642 F2d 136, 138-140 (CA 5, 1981), and *United States v Lipscomb*, 226 US App DC 312; 702 F2d 1049 (1983). As these courts noted, FRE 609 does not distinguish between convictions arising from guilty pleas and those arising from no-contest or not-guilty pleas. *Brewer, supra* at 1096. Similarly, MRE 609 does not contain such a distinction.[10]

A plea of no contest "admits 'every essential element of the offense [that is] well pleaded in the charge.' " *Williams, supra* at 138, quoting *Lott v United States*, 367 US 421, 426; 81 S Ct 1563, 1567; 6 L Ed 2d 940 (1961). Although a no-contest plea cannot be used as an admission, it nevertheless forms the basis of a conviction that can be used to impeach, just as a conviction following a not-guilty plea and trial can be used to impeach credibility. *Williams, supra* at 139. Therefore, the fact that Dr. Sutton's conviction of attempted perjury resulted from a plea of no contest bears no relevance in the analysis whether the conviction can be used to impeach his credibility.

Moreover, because this conviction indisputably falls within the class of crimes that "contain[] an element of dishonesty or false statement" that are available for impeachment use pursuant to MRE 609(a)(1), the trial court may not engage in the balancing test of MRE 609(b) or MRE 403 to exclude the conviction because of its prejudicial effect. *People v Allen*, 429 Mich 558, 593-594, 594 n 16; 420 NW2d 499 (1988) ("Since we find that as a matter of law prior convictions of crimes involving dishonesty or false statement are more probative than prejudicial, it obviously

---

[10] MRE 609(d), however, does except from admissibility convictions that have been pardoned or annulled, in certain circumstances.

cannot be argued that the probative value is 'substantially outweighed' by prejudice."). Accordingly, the trial court lacked the discretion to prohibit MPMLC from impeaching Dr. Sutton with his conviction of attempted perjury, although MPMLC could not have done so by indicating that Dr. Sutton pleaded no contest to that crime.

Despite the trial court's improper exclusion of this evidence, we need not reverse because failure to do so would not be inconsistent with substantial justice. MCR 2.613. Through Dr. Sutton's testimony, the jury learned that Dr. Sutton pleaded guilty to CSC charges and that he later testified that he did not commit those crimes. Although the jury did not learn that he was convicted of attempted perjury, the readily apparent inconsistencies in his testimony could have conveyed his lack of credibility to the jury with equal force.

MPMLC next argues that the trial court abused its discretion by excluding the complaints filed in the initial civil suits against Dr. Sutton. We disagree. In ruling on the plaintiff-patients' motion in limine, the trial court stated that admitting the pleadings from the underlying civil suits, suits that were never tried, would contravene principles behind permitting alternative or inconsistent pleading and, therefore, concluded that the pleadings in the underlying civil suits did not constitute admissions. MPMLC asserts that because the jury was charged with determining credibility, it was entitled to know that the plaintiff-patients alleged in the underlying civil suits that Dr. Sutton intentionally touched them.

On the contrary, we conclude that the trial court appropriately relied on principles underlying alterna-

tive pleading in granting the plaintiff-patients' request to exclude the complaints because the plaintiff-patients alleged that Dr. Sutton acted either "intentionally or in a grossly negligent manner." In *Larion v Detroit*, 149 Mich App 402, 407; 386 NW2d 199 (1986), this Court stated that "a party should not be placed in the position of having to forego a claim at the risk of having inconsistent allegations treated as admissions." In support of its decision that alternative pleadings are an exception to the general rule permitting treating pleadings as admissions, the Court quoted with approval McCormick on Evidence (3d ed, 1984), § 265, pp 780-782:

> "A basic problem which attends the use of written pleadings is uncertainty whether the evidence as it actually unfolds at trial will prove the case described in the pleadings. Traditionally a failure in this respect, *i.e.*, a variance between pleading and proof, could bring disaster to the pleader's case. As a safeguard against developments of this kind, the common law evolved the use of counts, each a complete separate statement of a different version of the same basic claim, combined in the same declaration, to take care of variance possibilities. . . . The modern equivalent of the common law system is the use of alternative and hypothetical forms of statement of claims and defenses, regardless of consistency. It can readily be appreciated that *pleadings of this nature are directed primarily to giving notice and lack the essential character of an admission. To allow them to operate as admissions would render their use ineffective and frustrate their underlying purpose. Hence the decisions with seeming unanimity deny them status as judicial admissions, and generally disallow them as evidential admissions."* [*Larion, supra* at 408 (emphasis in *Larion*).]

Accordingly, the trial court properly concluded that the alternatively stated claims in the plaintiff-patients'

underlying civil suits did not constitute admissions that could be used against them at trial.

Next, MPMLC claims that the trial court abused its discretion by overruling MPMLC's hearsay objection and permitting Dr. Sutton to testify about the impressions his attorney's statements made on him concerning the plea-taking and sentencing process. We disagree.

At trial, Dr. Sutton testified that when talking to his attorney during plea negotiations in the various criminal cases, he gained certain impressions concerning the consequences he would face if he accepted or rejected the various plea bargains offered. Although the trial court did not permit Dr. Sutton to testify directly about his attorney's statements, it stated:

> However, I don't think that stops you from inquiring of your client that he was under certain impressions and that that's why he did things. Based on what he had been told by his lawyer, he did certain things.
>
> He took certain, made certain decisions to avoid. I think you can get at it indirectly in any event.

MPMLC contends that permitting Dr. Sutton to testify to his impressions does not differ from permitting him to testify about his attorney's statements because his impressions were founded on his attorney's statements. MPMLC also contends that the statements were being offered for the truth of the matter asserted because the relevance of the statements depended on their truth. In other words, unless Dr. Sutton believed the statements were true, MPMLC claims, he would not

have responded to the statements in the manner he did.[11]

Contrary to MPMLC's arguments, the impressions Dr. Sutton formed from his attorney's statements are analytically distinguishable from the statements themselves. For example, Dr. Sutton may have misunderstood his attorney's statements and gained impressions that did not correspond with his attorney's intentions. In any event, the statements were not being offered for their truth, but for their effect on Dr. Sutton and were, therefore, admissible. *City of Westland v Okopski*, 208 Mich App 66, 77; 527 NW2d 780 (1994) (holding that a 911 tape was admissible to show why police officers responded to a specific location). Accordingly, the trial court properly permitted Dr. Sutton's testimony.

MPMLC next asserts that the trial court abused its discretion by excluding the written settlement agreements from evidence. We disagree. At trial, the trial court sustained the plaintiff-patients' objection to MPMLC's request to admit the agreements into evidence and stated:

> If we put these in, I see great confusion for the jury. You guys are looking at this in terms of spin. I am not. I am looking at it in terms of confusion, and they could easily come to a conclusion that there are all kinds of insurance companies out there that I would have to—we would have to go into another section for this court to explain what's happened with regard to those other companies and where that all stands, and I am not about to do that.

---

[11] MPMLC offers no legal authority to support its argument that the witness's belief in the declarant's statement determines whether the statement is being offered for its truth and has, consequently, abandoned this argument. *Flint City Council, supra.*

MPMLC argues on appeal that the agreements were relevant to the relationship between Dr. Sutton and the plaintiff-patients and were "crucial" to the jury's determination of credibility. Because the agreements were relevant, MPMLC claims, they should have been excluded only if the danger of confusion "substantially outweighed" their probative value. MRE 403. MPMLC contends that the potential for confusion was minimal and that any confusion could have been eliminated by a jury instruction on the issue.[12]

We agree with the trial court's determination that the agreements could create confusion in the minds of the jurors because insurers other than MPMLC, the only insurer participating at trial, are listed in the agreements. Additionally, the documents have minimal probative value because the existence of the agreements, and therefore the relationship between the plaintiff-patients and Dr. Sutton, was conceded at trial. Although whether the danger of confusion "substantially outweighed" the probative value of the agreements is a close question, this Court does not find an abuse of discretion when faced with a close evidentiary question, *Aldrich, supra,* and we, therefore, affirm the trial court's decision on this issue.

MPMLC next contends that the trial court abused its discretion by permitting Dr. Sutton's counsel to ask leading questions of Dr. Sutton and the plaintiff-patients on cross-examination. We disagree. MRE 611(c)(2) states: "Ordinarily leading questions should be permitted on cross-examination." As the word "ordinarily" indicates, a trial court is not always

---

[12] Notably, however, MPMLC did not suggest during trial that the trial court attempt to eliminate any confusion with a jury instruction.

required to permit leading questions on cross-examination. MPMLC urges this Court to follow the 1972 Advisory Committee notes to proposed FRE 611(c), which contains the same language as MRE 611(c)(2). The committee stated:

> The purpose of the qualification "ordinarily" is to furnish a basis for denying the use of leading questions when the cross-examination is cross-examination in form only and not in fact, as for example the "cross examination" of a party by his own counsel after being called by the opponent (savoring more of a re-direct) or of an insured defendant who proves to be friendly to the plaintiff.

Although the trial court has the discretion to prohibit leading questions on cross-examination, it does not follow that the trial court abuses its discretion if it permits leading questions in the situations mentioned in the committee notes. See *Morvant v Constr Aggregates Corp*, 570 F2d 626, 635 (CA 6, 1978). MPMLC, therefore, has not demonstrated that the trial court abused its discretion.

Next, MPMLC argues that the trial court abused its discretion by denying MPMLC's motion for new trial based on the great weight of the evidence. We disagree.

> In deciding whether to grant or deny a motion for a new trial, the trial court's function is to determine whether the overwhelming weight of the evidence favors the losing party. This Court gives substantial deference to a trial court's determination that the verdict is not against the great weight of the evidence. This Court and the trial court should not substitute their judgment for that of the jury unless the record reveals that the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. [*Campbell, supra* at 193 (citations omitted).]

Contrary to MPMLC's assertions, this is not "one of those few cases where a genuine miscarriage of justice can be found" if the verdict stands. MPMLC bases its argument on the existence of conflicting evidence and its contention that the evidence of Dr. Sutton's criminal convictions should carry great weight.

> [W]hen testimony is in direct conflict and testimony supporting the verdict has been impeached, if "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it," the credibility of witnesses is for the jury. [*People v Lemmon*, 456 Mich 625, 643; 576 NW2d 129 (1998), quoting *Anderson v Conterio*, 303 Mich 75, 79; 5 NW2d 572 (1942).]

During trial, Dr. Sutton offered explanations for his decisions to enter guilty pleas and no-contest pleas in his criminal cases. He also testified that the injuries from which he suffered, as well as the conditions from which the plaintiff-patients suffered, could have increased the risk of contacting a patient's clitoris. Although his testimony and that of the plaintiff-patients was impeached at trial, it was not deprived of all probative value. "The credibility of a witness is determined by more than words and includes tonal quality, volume, speech patterns, and demeanor, all giving clues to the factfinder regarding whether a witness is telling the truth." *Lemmon, supra* at 646, citing *State v Turner*, 186 Wis 2d 277; 521 NW2d 148 (Wis App, 1994). The jury had the opportunity to perceive all of these factors, as did the trial court, and it cannot be said that the trial court abused its discretion by denying the motion.

MPMLC also argues that the trial court abused its discretion by granting the plaintiff-patients' motion

for further relief. We disagree. MCR 2.605(F) provides that "[f]urther necessary or proper relief based on a declaratory judgment may be granted, after reasonable notice and hearing, against a party whose rights have been determined by the declaratory judgment." MPMLC claims that the money judgment granted by the trial court was neither necessary nor proper because the plaintiff-patients could have refiled the underlying civil suits, providing MPMLC a "fair" opportunity to participate in settlement negotiations or trial. We note, however, that MPMLC had the opportunity to participate in the settlement negotiations in the underlying civil suits but chose not to participate. Moreover, the existence of an alternative means of proceeding does not defeat the propriety of the trial court's order. MPMLC also asserts that the settlement amounts are excessive because the jury decided that Dr. Sutton's acts were unintentional, a decision inconsistent with the plaintiff-patients claims in the underlying suits. This argument lacks merit, however, because the settlement agreements also resolved the plaintiff-patients' alternative claims of negligent behavior.

Additionally, MPMLC contends that enforcement of the settlement agreements is improper because the jury considered only the criminality of Dr. Sutton's acts and not the amount of damages. This argument also lacks merit. The complaint in this action put MPMLC on notice that the plaintiff-patients requested enforcement of the settlement agreements, yet MPMLC raised no objections to this request, did not contest the validity of the settlement agreements throughout this litigation, and did not indicate to the trial court

that the jury should also consider the amount of damages.[13]

MPMLC also claims that the complaint did not allege causes of action that could support a money judgment, citing MCR 2.111(B). MPMLC, however, did not move for a more definite statement or to strike the request for money damages from the complaint. See *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55; 535 NW2d 529 (1995). MPMLC should have raised with the trial court before trial its belief and desire that the issue of damages should also be submitted for determination by the jury. See *Hofmann*, *supra* at 92.

Finally, MPMLC argues that the judgment interest in this case should be adjusted to reflect amendments of MCL 600.6013 that took effect during the pendency of these appeals. We agree. As amended, the relevant portions of MCL 600.6013 provide:

(1) Interest is allowed on a money judgment recovered in a civil action, as provided in this section. However, for complaints filed on or after October 1, 1986, interest is not allowed on future damages from the date of filing the complaint to the date of entry of the judgment. As used in this subsection, "future damages" means that term as defined in section 6301.

\*    \*    \*

(5) Except as provided in subsection (6), for a complaint filed on or after January 1, 1987, but before July 1, 2002, if a judgment is rendered on a written instrument, interest is calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate of 12% per year compounded annually, unless the instrument has a higher

---

[13] Contrary to MPMLC's claims, the trial court did not state in its opinion resolving the motions for summary disposition that the *only* issue for the jury's resolution was whether Dr. Sutton's actions were criminal in nature.

rate of interest. In that case, interest shall be calculated at the rate specified in the instrument if the rate was legal at the time the instrument was executed. The rate shall not exceed 13% per year compounded annually after the date judgment is entered.

(6) For a complaint filed on or after January 1, 1987, but before July 1, 2002, if the civil action has not resulted in a final, nonappealable judgment as of July 1, 2002, and if a judgment is or has been rendered on a written instrument that does not evidence indebtedness with a specified interest rate, interest is calculated as provided in subsection (8).

(7) For a complaint filed on or after July 1, 2002, if a judgment is rendered on a written instrument evidencing indebtedness with a specified interest rate, interest is calculated from the date of filing the complaint to the date of satisfaction of the judgment at the rate specified in the instrument if the rate was legal at the time the instrument was executed. If the rate in the written instrument is a variable rate, interest shall be fixed at the rate in effect under the instrument at the time the complaint is filed. The rate under this subsection shall not exceed 13% per year compounded annually.

(8) Except as otherwise provided in subsections (5) and (7) and subject to subsection (13), for complaints filed on or after January 1, 1987, interest on a money judgment recovered in a civil action is calculated at 6-month intervals from the date of filing the complaint at a rate of interest equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, according to this section. Interest under this subsection is calculated on the entire amount of the money judgment, including attorney fees and other costs. The amount of interest attributable to that part of the money judgment from which attorney fees are paid is retained by the plaintiff, and not paid to the plaintiff's attorney.

MPMLC correctly argues that this case falls within the category of cases described in MCL 600.6013(6).

The plaintiff-patients filed this action between January 1, 1987, and July 1, 2002; the action did not result in a final nonappealable judgment as of July 1, 2002; and the judgment was rendered based on the insurance policy, which, pursuant to *Yaldo v North Pointe Ins Co*, 457 Mich 341, 346; 578 NW2d 274 (1998), constitutes a written instrument for purposes of the statute. MPMLC freely admits that the trial court correctly applied the law as it existed at the time of its decision and applied an interest rate of twelve percent.

The plaintiff-patients argue that this Court cannot consider the issue presented by MPMLC because MPMLC consented to the trial court's application of the twelve-percent interest rate. However, because the Legislature had not enacted the relevant amendments of MCL 600.6013 when the trial court entered the judgment in this case, MPMLC had no basis upon which it could have objected. MPMLC's agreement to apply the law as it then existed does not amount to a consent judgment, order, or decree that MPMLC cannot appeal. See *Dora v Lesinski*, 351 Mich 579, 582; 88 NW2d 592 (1958).

The plaintiff-patients also argue that the judgment rendered was a "final, nonappealable" judgment not subject to modification to provide for the rate found in MCL 600.6013(8). In support of this contention, they argue that because MCR 7.203(B)(5) grants this Court jurisdiction over "any judgment or order when an appeal of right could have been taken but was not timely filed," virtually any judgment based on a written instrument that was rendered in the specified time frame is subject to modification. The Legislature, the plaintiff-patients claim, could not have intended such a broad result. It is not necessary for this Court

to examine the reach of the Legislature's action, however. Because the judgment at issue fits within the classification described in MCL 600.6013(6), we remand to the trial court for modification of the judgment to conform to MCL 600.6013(8).[14]

### B. INTERVENING-PLAINTIFF SCHNEIDER'S CROSS-APPEAL

Schneider first argues that MPMLC waived all defenses other than the applicability of the criminal acts exclusion by not asserting them when it initially denied coverage. Because the trial court did not address this issue, it has not been properly preserved. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). Nevertheless, we will briefly address it. We conclude that MPMLC did not waive defenses to Schneider's intervening complaint by failing to assert them when it initially denied coverage. Schneider's reliance on cases such as *Smith v Grange Mut Fire Ins Co of Michigan*, 234 Mich 119, 122; 208 NW 145 (1926), is misplaced. *Smith* provides that when an insurer denies coverage, it must assert or waive every defense to coverage based on the policy. Because the defenses MPMLC later raised, such as res judicata, were not based on the policy, they were not waived.

Schneider also argues that the trial court erroneously granted MPMLC summary disposition because res judicata does not bar her claims. The trial court, however, did not conclude that res judicata barred

---

[14] See *Morales v Auto Owners Ins Co (After Remand)*, 469 Mich 487, 490 n 4; 672 NW2d 849 (2003) (applying the most recent amendments to MCL 600.6013 to a judgment rendered before the amendments were enacted).

Schneider's claims. Rather, it concluded that because the jury's verdict convicting Dr. Sutton constituted conclusive evidence of criminal activity, no genuine issue of material fact precluded summary disposition in MPMLC's favor. We need not, therefore, examine the applicability of res judicata to this case.

Schneider also argues, however, that because her second claim, based on allegations that Dr. Sutton removed her bra during a 1991 bronchial examination, did not form the basis of criminal charges, the trial court erred by concluding that Dr. Sutton's conviction regarding the 1990 incident supported granting MPMLC summary disposition on her second claim. Because it is unclear from the trial court's ruling whether the trial court considered Schneider's claims separately, we remand to the trial court to consider whether any genuine issue of material fact exists concerning the applicability of the criminal acts exclusion to Schneider's claims arising out of her 1991 bronchial examination.[15]

### C. LAKE STATES' APPEAL

Lake States argues that the trial court erred by granting Schneider summary disposition regarding coverage for her claim of negligent hiring and super-

---

[15] We reject MPMLC's request that we assume that the trial court considered that the 1991 examination did not form the basis of criminal charges against Dr. Sutton. Similarly, we decline MPMLC's request that we nevertheless affirm the trial court's decision because Dr. Sutton committed fourth-degree CSC during the 1991 examination, triggering the applicability of the criminal acts exclusion. Other than presenting Schneider's opinions that the act of removing her bra did not have a medical purpose, MPMLC offers no evidence to support its contention that removing a patient's bra while listening to a patient's chest is medically recognized as unethical or unacceptable. See MCL 750.520e(1)(b)(iv). Accordingly, we will not determine that, as a matter of law, Dr. Sutton committed a criminal act.

vision against Mid-Michigan Family Physicians, P.C. We agree. " '[I]f the allegations of the underlying suit *arguably* fall within the coverage of the policy, the insurer has a duty to defend its insured.' " *Radenbaugh v Farm Bureau Gen Ins Co of Michigan*, 240 Mich App 134, 137; 610 NW2d 272 (2000), quoting *Royce v Citizens Ins Co*, 219 Mich App 537, 543; 557 NW2d 144 (1996) (emphasis supplied), in turn citing *American Bumper & Mfg Co v Hartford Fire Ins Co*, 207 Mich App 60, 67; 523 NW2d 841 (1994), aff'd 452 Mich 440; 550 NW2d 475 (1995).

Lake States contends that this Court should first examine the viability of Schneider's underlying claim, stating that Schneider has offered no factual support for her claim of negligent hiring and supervision.[16] We decline to do so. The issue before the trial court was whether, as a matter of law, Lake States was obligated to defend Mid-Michigan Family Physicians, P.C., against Schneider's claim. Because the scope of an insurer's duty to defend can require an insurer to defend against frivolous lawsuits, *Auto-Owners Ins Co v City of Clare*, 446 Mich 1, 10; 521 NW2d 480 (1994), we will not determine whether the claim would succeed before deciding whether the policy requires Lake States to defend against the allegations in the complaint.

Next, Lake States argues that Schneider's claim of negligent hiring and supervision constitutes a claim of medical malpractice and is, therefore, excluded from

---

[16] Lake States also argues that summary disposition was improper because Schneider's claim against Mid-Michigan Family Physicians, P.C., is a "sham" because Dr. Sutton *is* Mid-Michigan Family Physicians, P.C. Lake States did not preserve this argument in the trial court, and we decline to address it. *Fast Air, Inc, supra.*

coverage under the policy's professional services exclusion.[17] We agree that Schneider's claim against Mid-Michigan Family Physicians, P.C., is excluded from coverage because it arose out of rendering or failing to render a professional service.

The Lake States policy does not provide coverage for " '[b]odily injury' or 'property damage' due to rendering or failure to render any professional service. This includes but is not limited to . . . [m]edical, surgical, dental, x-ray or nursing services or treatment; . . . [a]ny health service or treatment." The policy's definition of professional services also includes "supervisory . . . services." Lake States relies on cases such as *Bronson v Sisters of Mercy Health Corp*, 175 Mich App 647, 652-653; 438 NW2d 276 (1989), to show that a failure to properly hire and supervise physicians constitutes medical malpractice.[18] We need not resolve this question, however, because the relevant inquiry is whether the injury resulted from rendering or failing to render a professional service.

Although Schneider contends that *St Paul Fire & Marine Ins Co v Quintana*, 165 Mich App 719; 419 NW2d 60 (1988), leads to the conclusion that her injuries did not result from rendering or failing to render professional services, that case is inapplicable because it addresses only a *physician's* provision of

---

[17] Although Schneider admits that the policy does not cover Dr. Sutton's actions because they arose out of providing professional services, she does not admit that the corporation's actions are likewise excluded from coverage.

[18] See also *Dorris v Detroit Osteopathic Hosp Corp*, 460 Mich 26, 45-47; 594 NW2d 455 (1999) (relying on the *Bronson* Court's analysis for determining the applicable statute of limitations to establish whether the plaintiff needed to comply with certain requirements of MCL 600.2912b and MCL 600.2912d).

medical services. *Id.* at 724. Our concern, rather, is whether Mid-Michigan Family Physicians, P.C., provided or failed to provide a professional service when it allegedly negligently failed to supervise Dr. Sutton. Whether a professional service is being rendered depends on the nature of the act or omission, not the character or title of the person who acted or failed to act. See *American Fellowship Mut Ins Co v Ins Co of North America*, 90 Mich App 633, 636-638; 282 NW2d 425 (1979) (also stating that "professional services" include any business activity performed by insured company); see also *Centennial Ins Co v Neyer, Tiseo & Hindo, Ltd*, 207 Mich App 235, 238-239; 523 NW2d 808 (1994).

Properly supervising employees to prevent patient harm is part of providing health services, which was the undertaking of Mid-Michigan Family Physicians, P.C. See *Bronson, supra* at 652-653 ("The providing of professional medical care and treatment by a hospital includes supervision of staff physicians and decisions regarding selection and retention of medical staff."). Moreover, Schneider's claim against Mid-Michigan Family Physicians, P.C., depends on Dr. Sutton's actions, which, admittedly, are excluded from coverage. In a similar situation, the court in *Duncanville Diagnostic Center, Inc v Atlantic Lloyd's Ins Co of Texas*, 875 SW2d 788, 791-792 (Tex App, 1994), decided that a similar professional services exclusion applied equally to the plaintiff's claim of negligent hiring and supervision against the defendant medical center and the plaintiff's negligence claims against the health care provider because the two claims are interrelated. See also *American Rehabilitation & Physical Therapy, Inc v American Motorists Ins Co*, 829 A2d

1173, 1177-1179 (Pa Super, 2003), citing *Millers Casualty Ins Co of Texas v Flores*, 876 P2d 227 (NM, 1994), and *Duncanville, supra* (also stating that supervising employees constitutes a vital part of providing medical services and is excluded from coverage by the "professional services" provision). Accordingly, we conclude that Schneider's claim of negligent hiring and supervision is not covered by the policy and that the trial court erroneously granted Schneider, rather than Lake States, summary disposition.[19]

### IV. CONCLUSION

In MPMLC's appeal, we conclude that although the trial court erroneously excluded evidence of Dr. Sutton's attempted perjury conviction, reversal is not necessary. We affirm each of the trial court's other rulings challenged by MPMLC on appeal. Finally, we remand for the trial court to amend the judgment to provide interest as dictated by the recent amendments to MCL 600.6013.

In Schneider's cross-appeal, we remand to the trial court for consideration of whether a genuine issue of material fact exists concerning the applicability of the criminal acts exclusion to Schneider's claim arising out of her 1991 bronchial examination. We affirm the trial court's grant of summary disposition to MPMLC in all other respects.

In Lake States' appeal, we conclude that the trial court erroneously granted Schneider summary dispo-

---

[19] Because we conclude that the policy does not provide coverage for Schneider's claim, we need not address Lake States' alternative argument that the claim does not qualify as an occurrence under the policy.

sition and remand for entry of summary disposition in Lake States' favor.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.