# STATE OF MICHIGAN

# COURT OF APPEALS

PATRICIA C. GRAVEL-HENKEL, MARK B. HENKEL, and IAN F. HENKEL,

Plaintiffs-Appellants,

v

AAA MICHIGAN and US HEALTH & LIFE INSURANCE COMPANY,

Defendants,

and

DAVID BURRITT MOODY,

Defendant-Appellee.

UNPUBLISHED
April 12, 2016

No.   325435
Washtenaw Circuit Court
LC No.   11-000973-NI

Before:  Boonstra, P.J., and Wilder and Meter, JJ.

Per Curiam.

Plaintiffs appeal as of right the trial court's judgment entered following a jury verdict of no cause of action in favor of defendant David Burritt Moody[1] regarding plaintiffs' action for alleged negligence by defendant resulting in a car accident.  Specifically, plaintiffs argue that the trial court erred by denying their postjudgment motions for judgment notwithstanding the verdict (JNOV), a new trial, or additur.  We affirm.

## I.  FACTS AND PROCEDURE

After growing up in Michigan, plaintiff[2] moved to Boston to attend Harvard University, where she obtained her bachelor's degree.  In 1989, while still living in Boston, plaintiff underwent spinal fusion surgery for lumbar scoliosis.  She underwent physical therapy after the

---

[1] Because Moody's codefendants are not parties to the instant appeal, we refer to Moody simply as "defendant."

[2] We refer to Patricia as "plaintiff" *infra* unless otherwise specified.

-1-

surgery and testified that she no longer experienced any back pain. The surgery "resolved the issue pretty much as far as [she] was concerned," and she "didn't have any back issues" between her recovery from the 1989 surgery and the car accident out of which this case arises.

After living and working in Boston for many years, plaintiff returned to Michigan and obtained her law degree from Michigan State University. She worked in several legal positions, then opened her own practice, which, according to plaintiff, was a "broad-based litigation practice" consisting of family law, contracts, small corporations, and employment disputes. She was "very selective of [her] clients, and . . . did turn people away," working an average of 50 hours per week.

In August 2009, plaintiff and defendant were involved in the car accident that is at issue in this matter. It is undisputed that defendant was at fault; indeed, he expressly acknowledged his fault at the jury trial in this matter, stating, "I caused this accident."

Plaintiff eventually filed suit against defendant, alleging that she was entitled to excess economic damages under § 3135 of the no-fault act, and that, under that same section, she suffered serious impairment of body function and was, therefore, entitled to noneconomic damages. Plaintiff's husband, Mark Henkel, and her son, Ian Henkel, brought derivative claims for loss of consortium.

A five-day jury trial ensued. Plaintiff testified that, before the accident, she was physically active. She enjoyed walking, running on a treadmill, biking, and inline skating. She stated that she was active in sports, including ice skating and canoeing. Her testimony in that regard was corroborated by several of plaintiff's relatives. Both plaintiff and her husband further testified that plaintiff had no "back issues" between her 1989 surgery and the subject accident.

But following the accident, plaintiff was diagnosed with a concussion, neck pain, and back pain. Three days afterward, she saw her primary care physician, Dr. Zazove, complaining of pain in her neck and "lower left back," and "radiating pain that was wrapping around [her] hip and" traveling down her leg. Although the neck pain subsided within a month of the accident, the back pain persisted. Plaintiff testified that her post-accident back pain differed from any back pain she had previously suffered. She underwent physical therapy in hopes of remedying the pain, but the therapy only exacerbated her pain. She also pursued alternative, nonsurgical options, including acupuncture and massage, but she received minimal relief.

According to plaintiff, in the months following the accident, she tried to continue her work as an attorney, but her pain was excruciating; it took her five times longer to accomplish tasks and she could not sit at her desk or otherwise work comfortably. Potential clients approached plaintiff, but she could not take their cases due to her back pain. Specifically, plaintiff testified that she had lost confidence, her mental acuity, and her ability to concentrate. Moreover, she was unable to drive to court and sit or stand for any extended period of time. She did some legal work at home but earned only about $300.

Due to her continuing pain, plaintiff was eventually referred to Dr. Louis Bojrab, an interventional pain specialist. At her initial consultation, plaintiff informed Bojrab about her 1989 scoliosis surgery, and his notes contain the following statement: "There were no other

problems with her back, and she had been pain-free since [the 1989 surgery], until the accident[.]" Bojrab testified that he treated plaintiff from November 23, 2010—approximately 15 months after the accident—until the time of trial. During such time, on a scale of zero to 10, with 10 being the highest level, plaintiff's pain level has generally "always" been 6 out of 10. Bojrab ordered an MRI and CT scan, which revealed a spinal condition known as "lateral spondylolisthesis." Bojrab classified the condition as a "fairly rare disorder," describing it as follows:

> So, if you think about a spine, and [the] vertebrae are like little rings, doughnuts stacked on top of each other, and they have points where they rest on each other. And a lateral spondylolisthesis is, literally, one ring sliding on the other laterally. The top one moved forward on the bottom one, towards her left. And it wasn't a little bit. If you think about the injury, it's two pipes that you separate, you get compression of the internal parts. You only have, at most, three centimeters of space in the diameter of the spinal canal, and when one bone slides on the other one—if it goes all the way, it's a complete transection and it's a complete paralysis. Even bowel and bladder function are lost.
>
> In [plaintiff's] case, she had 15 millimeters, so it's 50 percent of the spinal canal where the top bone slid over the bottom bone.

Bojrab opined that trauma, e.g., an automobile accident, could cause lateral spondylolisthesis, and was a more likely cause than was degenerative "wear and tear":

> Trauma can cause it. It's fairly normal for a trauma case to be the inciting incident for a spondylolisthesis. It's really unusual for a spondylolisthesis that's lateral to occur degeneratively. Degenerative is just fancy words [sic] for wear and tear, right. So, if it's somebody's arthritis or wear and tear, usually, they'll slip forward or backward. It is really unusual to see sideways.

Finally, Bojrab stated that, had plaintiff been suffering from lateral spondylolisthesis before the accident, it was "very likely" that she would have experienced back pain.

Roughly a year after her initial consultation with Bojrab, plaintiff had a surgical consultation with Dr. Nilesh Kotecha. Kotecha's examination revealed that plaintiff had diminished reflexes in her lower extremities, suggesting that she had nerves that were "malfunction[ing] from being pinched or from being injured[.]" Kotecha recommended surgical fusion of a portion of plaintiff's spine. Upon learning that she needed surgery, plaintiff began "closing out" her client accounts and winding up her law practice. Kotecha performed the surgery on December 16, 2011. Plaintiff was required to remain in the hospital for several days and to wear back braces for a period of several months. Kotecha testified that, despite the successful surgery, plaintiff "will always have some degree of pain pretty much for the rest of her life[.]" Although Kotecha would, for at least two years after the surgery, restrict plaintiff from lifting "more than like 2 to 4 pounds," he acknowledged that his restrictions did not limit plaintiff from standing or walking, nor restrict her from any type of employment. Likewise, Kotecha admitted that he could not definitively attribute plaintiff's spinal issues to the subject accident, further admitting that his medical opinions were based on the medical history provided

by plaintiff herself, which included no report of back problems prior to the subject accident. Similarly, Bojrab confirmed that plaintiff never told him about any medical treatment she received for back pain or injuries between 1989 and the subject automobile accident.

Contrary to plaintiff's self-reported medical history, however, defense counsel introduced evidence indicating that, between 1989 and the subject automobile accident, plaintiff had complained of back pain, or been treated for it, numerous times. Specifically, between November 2004 and November 2008, notations in plaintiff's medical records indicated that she had been seen by doctors for back pain, or received testing for such pain, on at least eight occasions. During such doctor visits—which occurred before the subject accident—plaintiff complained of muscle spasms, fatigue, problems concentrating, trouble at work with prolonged periods of sitting or standing, and pain that both prevented "her from doing much" and forced her to take medication, including Valium, Flexeril (a prescription muscle relaxant), and ibuprofen.

In attempting to establish her claim for excess wage loss, plaintiff primarily relied on tax returns for her law practice for the years 2008 through 2011, which provided a net loss of $11,376 in 2008, a net profit of $2,107 in 2009, a net profit of $302,977 in 2010,[3] and a net profit of $1,704 in 2011. Notably, such tax returns were filed after plaintiff had already been deposed in this matter. Plaintiff denied any relationship between the late filings and this case. She attempted to use the tax returns to establish a yearly average future income, i.e., wage loss, of approximately $100,000. But she acknowledged that in an unrelated parenting time dispute in 2007, she represented to a court that she was indigent and unable to pay approximately $4,000 in court costs.

Plaintiff nevertheless maintained that her law practice was successful and that she charged $275 per billable hour before the accident. She testified that the majority of her billing was hourly, but sometimes deferred hourly. Plaintiff claimed that the losses reflected in her tax returns were due to some fee structures, i.e., contingent or deferred hourly, and the fact that she obtained judgments that were unpaid or not paid in full. She stated that she loved working as an attorney and would have continued such employment indefinitely had she not been injured in the subject accident.

Plaintiff introduced the testimony of Robert Ancell—a vocational rehabilitation counselor and case manager—who prepared a report that was admitted into evidence. Ancell's report concluded that, "[a]t the present time, given the nature and extent of [plaintiff]'s limitations, she is unemployable" and that, "[g]iven her ten years of experience and track record according to her history, the median salary at [sic] $92,000 is a reasonable estimate of her earning ability[.]" According to Ancell, given plaintiff's age (she was 56 years old at the time of trial), and her difficulties with pain and concentration, he did not believe there were jobs of a "lesser demand" that she could perform. Ancell opined that, although whether plaintiff could

---

[3] Plaintiff's net profit in 2010, of over $300,000, was attributable to the settlement of a complex litigation matter for which she received a large contingent fee. There is no record evidence that plaintiff was otherwise involved in such lucrative or complicated cases.

ever return to work was a medical question, he had "seen nothing" to suggest that plaintiff would not remain unemployable until retirement age. On cross-examination, Ancell testified that disability determinations and work restrictions must be imposed by medical professionals. He acknowledged that there was nothing in the medical records to indicate that plaintiff was disabled from working or under work restrictions, that he did not speak with any of plaintiff's doctors, and that the earliest medical record he was given postdated the subject automobile accident. Ancell further admitted that plaintiff told him that, following her recovery from her 1989 back surgery, she had "no [back] issues" until the subject accident. Finally, Ancell concurred with defense counsel's statement that one large fee received by an attorney does not necessarily establish a pattern of earnings.

The defense countered by introducing testimony from its own vocational rehabilitation counselor, Guy Hostetler. Hostetler testified that he reviewed plaintiff's medical records, deposition, and tax returns, as well as the depositions of plaintiff's physicians. He did not interview plaintiff herself. He stated that plaintiff's medical records only indicated physical restrictions of limited bending, twisting, and lifting more than five pounds for two years after the accident. He found no indication of psychological or psychosocial barriers to plaintiff returning to work. Hostetler opined that the tax returns supplied by plaintiff were insufficient to indicate her average income and could not even establish whether she was working full-time before the accident. That is, the tax returns supplied by plaintiff were insufficient to allow Hostetler to make a "determination in regards to [plaintiff's] future earnings[.]" Hostetler ultimately opined that, pursuant to his review of plaintiff's case, "the restrictions put forth by Dr. Kotecha[,]" and the relevant employment standards, plaintiff had "the ability to return to work as an attorney[.]" Hostetler stressed that his opinion was supported by the lack of restrictions in the copy of Bojrab's file he had reviewed. He stated that, if Bojrab testified to other restrictions that were not indicated in the medical records, his opinion might change but that, ultimately, whether plaintiff could return to work was a question for the jury to decide.

The defense also relied on the testimony of Sharon Filas, a certified public accountant, who prepared two reports, both of which were admitted into evidence. In Filas's first report, she wrote that she had reviewed (1) plaintiff's tax returns from 2008, 2009, 2010, and 2011; (2) plaintiff's deposition and answers to interrogatories; (3) Ancell's vocational rehabilitation evaluations; and (4) the parties' case evaluation summaries. Filas ultimately concluded that plaintiff's wage-loss claim was "overstated, speculative and [wa]s not supported by the documents" that had been provided to Filas. She listed numerous documents which would be required to substantiate plaintiff's income prior to the accident and her claim for economic damages. In preparation of her second report, Filas reviewed "various affidavits, judgments, invoices and court orders" that plaintiff supplied seeking to support her claimed income while working as an attorney before the accident. Filas concluded that, despite such documentation, plaintiff's claim remained unsupported.

Consistent with the conclusions in her reports, Filas testified that the information provided, i.e., four years of tax returns and some canceled checks, was insufficient to establish a future wage loss for plaintiff. Filas stated that to establish such a wage loss, she requested "the typical books and records," but they were not provided.

Sure, I requested a lot of documents, because I had a curiosity of why that one year was so high, why that one year was ten times the revenue of all those other years. And I wanted to understand her practice, I wanted to understand her clients, I wanted to understand how she billed, what her hours were, how she worked, what her pattern was in her typical law practice. And for me to understand that, I requested the typical books and records. They were not provided to me.

Some of them were, but bits and pieces were provided to me, and what I really wanted to look at was the basic books and records of the business: the revenue ledgers, the hours, the costs, going back to 2007, which was only two years before the accident happened.

And I requested several—I wanted to look at the client billings, I wanted to look at her Social Security earnings statement. She was in her early fifties when this loss happened. I wanted to see what her patterns of earnings were that she reported to the Social Security Administration over the years. There's a lot of questions that I had, other than just getting a couple of years of tax returns.

On cross-examination, plaintiff's counsel asked Filas whether, given her above testimony, she essentially had *no* opinion regarding plaintiff's case. Filas denied the implication: "No, I have an opinion . . . . I have an opinion that the wage loss claim is not supported by the records that have been provided so far."

After deliberating, the jury completed a special verdict form. It found that (1) plaintiff was injured, (2) defendant's negligence was a proximate cause of plaintiff's injuries, (3) plaintiff neither did nor would suffer economic loss, and (4) her injuries did not result in serious impairment of body function. After trial, plaintiffs moved for JNOV, a new trial, or additur on each claim. The trial court denied such motions.

## II. ANALYSIS

"We review de novo a trial court's ruling on a motion for JNOV," *Zaremba Equip, Inc v Harco Nat Ins Co*, 302 Mich App 7, 15; 837 NW2d 686 (2013), viewing "the evidence and all legitimate inferences therefrom in the light most favorable to the nonmoving party to determine if a party was entitled to judgment as a matter of law,"*Genna v Jackson*, 286 Mich App 413, 417; 781 NW2d 124 (2009). "When the evidence presented could lead reasonable jurors to disagree, the trial court may not substitute its judgment for that of the jury." *Foreman v Foreman*, 266 Mich App 132, 136; 701 NW2d 167 (2005). On the other hand, "[a] trial court's decision to grant or deny a motion for a new trial under MCR 2.611 is reviewed for an abuse of discretion," *Gilbert v DiamlerChrysler Corp*, 470 Mich 749, 761; 685 NW2d 391 (2004), as is its "decision on a motion for additur," *Taylor v Kent Radiology*, 286 Mich App 490, 524; 780 NW2d 900 (2009). "An abuse of discretion occurs when a court chooses an outcome that is outside the range of principled outcomes." *Heaton v Benton Constr Co*, 286 Mich App 528, 538; 780 NW2d 618 (2009).

Plaintiff argues that the trial court erred by denying her motion for JNOV regarding her claim for excess economic damages. She also argues that the trial court abused its discretion by denying plaintiff's motions for a new trial or additur with regard to the same claim.[4] We disagree in both respects.

The no-fault act allows for third-party recovery of work-loss damages in excess of the three-year statute of limitation provided by the no-fault act. MCL 500.3135(3)(c); MCL 500.3107(1)(b); *Hannay v Dep't of Transp*, 497 Mich 45, 79; 860 NW2d 67 (2014). "[W]hile work-loss damages are compensable under the [] act, loss-of-earning-capacity damages are not." *Id.* "[D]amages for work loss consist of wages that a person 'would' have earned but for the accident, whereas loss-of-earning-capacity damages are wages a person 'could' have earned but for the accident." *Id.* at 80-81 (footnotes omitted). Accordingly, "work-loss damages are only available if the accident was the 'but for' cause—i.e., the cause-in-fact—of the work loss." *Id.* at 80. "The plaintiff bears the burden to prove the damages sought by a preponderance of the evidence." *Id.* at 79.

As she did at trial, on appeal plaintiff maintains that her spinal condition, i.e., "lateral spondylolisthesis," along with its resultant pain, was the cause-in-fact of her inability to work and, thus, of her work-loss damages.[5] To prevail on that theory at trial, plaintiff was required to prove, by a preponderance, that the accident was the but-for cause of her spinal injury.

But viewing the evidence in the light most favorable to defendant, we conclude that reasonable jurors could disagree about whether the accident was the but-for cause of plaintiff's claimed work-loss damages. A reasonable fact-finder could infer from the record evidence that plaintiff's spinal injury was suffered before the accident. Neither of plaintiff's two doctors who testified at trial were able to definitively state that the lateral spondylolisthesis *was* caused by the accident. Indeed, they both noted that, although uncommon, the condition could have been caused by mere degeneration. Indeed, Kotecha testified that, due to plaintiff's scoliosis surgery, the vertebrae upon which he operated would have borne a larger load since 1989, thus increasing

---

[4] Plaintiffs also argue that portions of Filas's expert testimony were inadmissible. By failing to duly include that evidentiary issue in their statement of questions presented, however, plaintiffs waived it. See *River Inv Group v Casab*, 289 Mich App 353, 360; 797 NW2d 1 (2010) ("This issue is waived because plaintiff failed to state it in the statement of questions presented in its brief on appeal."). Waiver "extinguish[es] any alleged error and foreclose[es] appellate review." *In re Tiemann*, 297 Mich App 250, 265; 823 NW2d 440 (2012). Moreover, even if the issue was properly presented for our review, we would nevertheless decline to consider it. Because plaintiffs failed to object to the pertinent testimony at trial, the issue is unpreserved. See *Genna*, 286 Mich App at 423. And because we do not upset the jury's verdict on the question of causation, our review of this unpreserved issue could not alter the outcome here. In other words, even if we decided that Filas's challenged testimony was inadmissible, we would nevertheless conclude that reasonable jurors could have disagreed as to whether the accident was the but-for cause of plaintiff's claimed work-loss damages.

[5] Plaintiff has never alleged that her work loss resulted from her neck injury or concussion.

the rate of degeneration. Defendant introduced medical records establishing that, in 2006, plaintiff had x-rays taken of her lower spine that indicated degeneration of the vertebrae upon which her surgeon later operated, and that, in the years leading up to the accident, plaintiff was treated for back pain on at least eight occasions. Given her earlier testimony that she had suffered no "back issues" between her recovery from the 1989 surgery and the subject accident, such evidence seriously undermined plaintiff's credibility. Additionally, plaintiff's medical records indicated that, in medical visits before the accident, she complained of many of the same symptoms as she did afterward, including fatigue, problems concentrating, trouble at work with sitting or standing for long periods, and pain that both prevented "her from doing much" and forced her to take medication. Thus, even though it was uncontroverted, a rational juror might have discounted plaintiff's testimony that her back pain before the accident differed from that she suffered after the accident. See *Taylor v Mobley*, 279 Mich App 309, 314 n 5; 760 NW2d 234 (2008) ("[T]he jurors' prerogative to disbelieve testimony, including uncontroverted testimony, is well established.").

Perhaps most significantly, plaintiff acknowledged that she failed to inform her post-accident treating physicians about any of her back problems between the 1989 surgery and the subject accident. Thus, to the extent her physicians suggested that plaintiff's lateral spondylolisthesis was caused by the accident (which they could not confirm), their medical opinions on that subject were formed without knowledge of plaintiff's significant and ongoing treatment for back pain between 2004 and 2008. Similarly, none of plaintiff's family members, who testified that plaintiff's back pain became significantly worse after the accident, acknowledged knowing about plaintiff's previous medical treatment for lower back pain. In any event, "it is the role of the jury to determine which witnesses it found credible and what weight to give the various evidence." *Freed v Salas*, 286 Mich App 300, 325; 780 NW2d 844 (2009).

Plaintiff contends that, even if she had a preexisting back condition, the accident obviously aggravated that condition, further arguing that great weight of the evidence indicates that such aggravation caused her work-loss damages. It is true that "[e]stablished principles require that the defendants take the plaintiff as he was, with his susceptibility to [a particular] injury[.]" *Wilkinson v Lee*, 463 Mich 388, 396; 617 NW2d 305 (2000), citing 2 Restatement Torts, 2d, § 461 ("The negligent actor is subject to liability for harm to another although a physical condition of the other which is neither known nor should be known to the actor makes the injury greater than that which the actor as a reasonable man should have foreseen as a probable result of his conduct."); see also *Fisher v Blankenship*, 286 Mich App 54, 63; 777 NW2d 469 (2009) ("[T]he aggravation or triggering of a preexisting condition can constitute a compensable injury."). However, although there was no direct evidence that plaintiff's lateral spondylolisthesis existed before the accident, inferences from the evidence, viewed in the light most favorable to defendant, could allow reasonable jurors to disagree as to whether the condition predated the accident. Specifically, an x-ray taken three years before the accident showed degeneration of plaintiff's vertebrae where the lateral spondylolisthesis later occurred, and plaintiff's surgeon testified that the condition can be caused by degeneration. In 2006, plaintiff complained to a doctor of lower back pain at the same level she suffered after the accident. Thus, the jury could reasonably infer that plaintiff's lateral spondylolisthesis, the alleged cause of her work loss, occurred *before* the accident and was not aggravated by the accident. In the case of the proverbial "eggshell" plaintiff, a negligent party may be liable for the injuries *caused* by his negligence, including any aggravation of the eggshell condition, but the

negligent party does not—regardless of causation—assume liability for the preexisting eggshell condition.

In sum, the evidence presented was sufficient to permit reasonable jurors to disagree as to whether plaintiff proved, by a preponderance of the evidence, that her spinal injury and its resulting pain were caused by the subject accident. Accordingly, the trial court properly allowed the jury's verdict to stand and did not err in denying plaintiff's motion for JNOV on her claim for excess economic damages.[6] See *Hannay*, 497 Mich at 79; *Foreman*, 266 Mich App at 136.

For the same reasons, the trial court did not abuse its discretion in denying plaintiff's motions for a new trial on her claim for excess economic damages. Because the jury found that plaintiff was not entitled to such damages, its verdict was not "grossly inadequate." MCR 2.611(A)(1)(d). Similarly, for the reasons set forth *supra*, the evidence did not preponderate so heavily against the verdict as to render it a miscarriage of justice. MCR 2.611(A)(1)(e); *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 518; 679 NW2d 106 (2004). Likewise, because there was an interpretation of the evidence that supported the jury's verdict, the trial court also did not abuse its discretion in denying plaintiff's motion for additur. See *Hill v Sacka*, 256 Mich App 443, 461; 666 NW2d 282 (2003).

Plaintiff also argues that the trial court erred by denying her motion for JNOV regarding her claim for noneconomic damages. We disagree.

Under the no-fault act, "[a] person remains subject to tort liability for noneconomic loss *caused by* his or her ownership, maintenance, or *use of a motor vehicle* only if the injured person has suffered . . . serious impairment of body function . . . ." MCL 500.3135(1) (emphasis added); *McCormick v Carrier*, 487 Mich 180, 189; 795 NW2d 517 (2010). Plaintiff only argues that her spinal injury constitutes a serious impairment of body function, not that her concussion or neck injury constituted such impairment. To obtain noneconomic damages for such impairment, plaintiff was required to establish that the injury causing the impairment was caused by defendant's negligence, i.e., the accident. MCL 500.3135(1). Since the evidence presented at trial could lead reasonable jurors to disagree as to whether plaintiff's spinal injury was caused by the accident, the trial court did not err in denying her motion for JNOV on her claim for noneconomic damages. See *Foreman*, 266 Mich App at 136.

Likewise, the trial court did not abuse its discretion by denying plaintiff's motions for a new trial on her claim for noneconomic damages. Because plaintiff was not entitled to those damages, the verdict was not grossly inadequate. MCR 2.611(A)(1)(d). Further, plaintiff has failed to demonstrate that the great weight of the evidence preponderated against the jury's finding that her spinal injury was not caused by the accident. MCR 2.611(A)(1)(e). And because there was an interpretation of the evidence that supported the jury's verdict, the trial

---

[6] Having reached this conclusion, we need not decide whether the jury's verdict regarding the *amount* of plaintiff's purported work-loss damages was contrary to the great weight of the evidence.

court did not abuse its discretion in denying plaintiff's motion for additur on her claim for noneconomic damages. See *Hill*, 256 Mich App at 461.

Finally, the trial court did not err in denying Mark and Ian's motions for JNOV on their claims of loss of consortium, nor did it abuse its discretion in denying Mark and Ian's motion for a new trial or additur on those same claims. Such claims are derivative, with recovery "contingent upon the injured spouse's recovery of damages for the injury." *Wesche v Mecosta Co Rd Comm*, 267 Mich App 274, 279; 705 NW2d 136 (2005) (quotation marks and citations omitted). Because plaintiff failed to obtain primary recovery, Mark and Ian's claims for loss of consortium necessarily fail.

Affirmed. As the prevailing party, defendant may tax costs pursuant to MCR 7.219.


/s/ Mark T. Boonstra
/s/ Kurtis T. Wilder
/s/ Patrick M. Meter