*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

YUSUF A. HAI,

      Plaintiff-Appellee,

V

CIG CAPITAL ADVISORS, INC.,

      Defendant-Appellant.

FOR PUBLICATION
June 18, 2026
11:14 AM

No. 370517
Oakland Circuit Court
LC No. 2022-194547-CB

Before: YOUNG, P.J., and BORRELLO and TREBILCOCK, JJ.

PER CURIAM.

A jury determined defendant breached its employment contract with plaintiff and awarded over three million dollars in damages. Defendant challenges the judgment on several grounds, including many of the trial court's pre-trial and trial rulings and the jury's findings. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Defendant, CIG Capital Advisors, Inc. (CIG), is a wealth-management company founded and run by Osman Minkara. Plaintiff, Yusuf Hai, successfully provided defendant consulting services as an independent contractor, resulting in the parties negotiating an employment agreement (to which the parties often refer to as the "letter agreement"). In addition to salary, bonus eligibility, and other customary employment terms, the contract set forth two different equity-earning provisions that form the basis of this dispute.

First, it gave to plaintiff 5% of "CIG-AM equity in new transactions," which could grow to 10% if plaintiff "was the procuring cause of the project." The second provision vested equity in what is now Business Advisory Services (BAS), CIG's consulting department. It states:

> An equity interest of 10% to be vested on your third anniversary with CIG based on consulting revenues hurdle rate to be established on annual basis. Your equity interest will be granted 3.33% of 10% for every year of service to be fully vested on the third anniversary. The annual equity percentage will be granted every year based on revenue hurdle rate. The equity interest amount will be reviewed on the third anniversary. In the event that CIG is sold, any granted equity will

-1-

automatically be vested.  If your employment is terminated within the first 24 months, your equity will be lost.  Between the 24th-36th month if terminated for cause or performance, your equity will be lost.  If terminated without cause or non-performance related between 24-36 months of service, your equity will be vested.

The agreement does not define "hurdle rate," and rather provides that "revenue hurdle rates" are to be "defined by [plaintiff's] direct report."  At trial, the parties offered differing testimony on this term and its import.  Plaintiff testified that the consulting revenue hurdle rate is what the department needed as a business to be viable, with Minkara explaining it was a target or threshold that was adopted and agreed upon by the department heads and management.  Minkara testified that he repeatedly informed plaintiff that he missed his "hurdle rates."  Plaintiff disagrees, asserting that Minkara had told him at these performance reviews that he had earned equity in BAS (totaling 10% after those first three years) and noting that his annual performance reviews do not mention "hurdle rates" or plaintiff not meeting them.

Operating with the belief that he had earned that equity stake, plaintiff agreed to stay with defendant and grow his equity in BAS to just shy of 50%.  Specifically, plaintiff testified that he and Minkara orally agreed to plaintiff continuing to earn 3.33% equity in BAS every year for 15 years, earning a total of 49.95% equity.  Minkara expressly denies that the parties made such a modification to the original agreement.

With that divergent understanding of the parties' relationship, we turn to facts leading to this lawsuit.  To facilitate a hospital's development in Saudi Arabia (known by the parties as the Aldara project), Minkara created Elixir Advisory Services, LLC (EAS), a subsidiary of CIG.  EAS and Aldara Medical Corporation entered into a 2012 consulting agreement, under which EAS ultimately billed Aldara over $26 million.  Some of these billings generated no profit because EAS passed along some incurred expenses to Aldara—a point acknowledged by plaintiff in his testimony when he explained that he initially was told that EAS was merely a "pass through" entity.  But other charges generated profit, namely in the form of monthly $160,000 invoices that covered various services provided by CIG.

Plaintiff first learned of these invoices in the summer of 2021.  That caused him concern because defendant allocated all of that revenue to EAS, with none to BAS despite BAS providing some services in support of the Aldara project.  And that allocation affected plaintiff's income—with that revenue not being allocated to BAS, plaintiff was not able to share in those profits as provided by the employment agreement.

So plaintiff started inquiring about the financial details and performance of EAS and BAS.  That led to disputes between plaintiff and Minkara, culminating in plaintiff having an outburst during a meeting in May 2022.  CIG suspended plaintiff and later terminated his employment.  This litigation followed.

The operative complaint asserted numerous causes of action, but we focus here on the one that advanced to trial—that defendant breached its contract with plaintiff by denying him the promised equity stake in BAS.  At trial, plaintiff testified in an effort to prove damages that a third party valued CIG at $12.8 million.  He then asserted that defendant owed him $1.656 million for lost profit sharing that should have occurred as a result of his equity interest, $2.813 million for

the value of lost equity, and $1.5 million for lost equity in Aldara, totaling $5.969 million. Over defendant's motion for a directed verdict asserting plaintiff's claim for equity interest was time-barred, the trial court held the period of limitations could be tolled until plaintiff knew or should have known of the existence of the breach under MCL 600.5855, and thus submitted the case to the jury with a jury instruction concerning fraudulent concealment (in order to determine whether tolling was applicable). The jury rendered a verdict in favor of plaintiff, finding that he suffered $3 million in damages. This appeal by right followed.

## II. REQUEST FOR MONETARY DAMAGES AND JURY

Defendant first argues that it was improper for the trial court to allow plaintiff to seek monetary damages on his breach-of-contract claim. On de novo review, *Parkwood Ltd Dividend Housing Ass'n v State Housing Dev Auth*, 468 Mich 763, 771-772; 664 NW2d 185 (2003), we disagree.

Before trial, defendant moved to strike plaintiff's request for a jury trial, noting that plaintiff's breach-of-contract claim asked whether plaintiff had equity in BAS and if so, how much. Defendant thus reasoned that plaintiff was seeking equitable relief—specific performance of the letter agreement. The trial court disagreed and denied the motion. During trial, defendant reiterated its argument that whether plaintiff is entitled to some equity interest in BAS is not the same as a right to money damages or a "buyout." The trial court again disagreed, holding that the complaint sought money damages and did not ask for declaratory relief.

Defendant advances two reasons why we should find error in the trial court's conclusions. First, defendant contends that a recovery of monetary damages puts plaintiff in a better position than if defendant had performed under the contract. It is true that the remedy for breach of contract is to "place the nonbreaching party in as good a position as if the contract had been fully performed." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 426 n 3; 751 NW2d 8 (2008) (quotation marks and citation omitted). However, we see nothing in the record demonstrating that allowing plaintiff to recover the monetary value of his owed equity puts him in a better position than having the equity. In both instances, plaintiff would recover the same *value*, just different forms—money, or a property interest that has the same value—of it.

The second rationale fares no better. Defendant asserts that the court could have awarded specific performance without creating an injustice. "Specific performance of an agreement may be an appropriate remedy where enforcement of the promise is necessary to avoid injustice." *Thermatool Corp v Borzym*, 227 Mich App 366, 375; 575 NW2d 334 (1998). It "is a remedy of grace and not of right, resting within the sound discretion of the court, the granting of which depends upon the peculiar circumstances of each case." *Dep't of Agriculture & Rural Dev v Engle*, 344 Mich App 213, 223; 999 NW2d 73 (2022) (quotation marks and citation omitted). Specific performance is not warranted when there is an adequate remedy at law. *Edidin v Detroit Economic Growth Corp*, 134 Mich App 655, 660; 352 NW2d 288 (1984). As already discussed, awarding plaintiff monetary damages is sufficient to place him in as good a position as if the contract had not been breached. Therefore, the trial court did not err by declining to award specific performance.

Defendant also argues that because plaintiff had no entitlement to monetary relief—making his sole available relief equitable in nature—he had no right to a jury trial. See, e.g., *Zurcher v Herveat*, 238 Mich App 267, 297; 605 NW2d 329 (1999) (a plaintiff is not entitled to a jury trial when seeking only equitable relief and not damages). But, as explained above, plaintiff was entitled to seek monetary damages. The trial court, therefore, correctly rejected defendant's arguments that plaintiff could not obtain money damages for his breach of contract claim.

## III. ADMISSIBILITY OF DAMAGES EVIDENCE

Defendant argues that the trial court also erred by admitting certain testimony from plaintiff related to the damages he suffered. We disagree.

This issue turns on preservation, so we set forth here some more factual details. Plaintiff testified that in October 2021, a third party valued CIG at $12.8 million. Defendant did not object to this testimony. Plaintiff later explained that to calculate his value of his interest in CIG, one would need to know the value of BAS (which is a part of CIG) because it was in BAS that he had his interest. He explained that for the pertinent years, he took the revenue from EAS and added it to the revenue of BAS. Then, once the total profit for BAS was identified for each year, he compared that amount to CIG's overall profits to get a BAS profit percentage for those years. According to plaintiff, those numbers showed that BAS was worth 44% of CIG. Again, defendant did not object to this testimony at trial.

Plaintiff then explained that after knowing that BAS constituted 44% of CIG, the next thing to do is to calculate the value of CIG. At this point, defense counsel objected on the ground that plaintiff was about to provide improper expert testimony. Plaintiff's counsel conceded that one of the things plaintiff was going to testify to was his personal valuation of CIG and that the $12.8 million valuation already admitted into evidence would be used to "validate" plaintiff's personal valuation; but if the court were not to allow plaintiff to perform his own valuation, then he simply would use the already admitted valuation of CIG and multiply that by BAS's share of 44% to get the value of BAS. Although defendant's counsel initially maintained that this was still improper, counsel relented after the court noted that all plaintiff would be doing is taking the $12.8 million valuation that was already admitted into evidence and multiplying by 44%. The trial court then ruled as follows:

> Okay. With regard to his testimony . . . in connection with the business valuation, I agree with defense counsel that he is blending into, blurring into expert testimony. And, therefore, having him testify with regard to the business value -- valuation of CIG would be impermissible expert testimony as it has -- he's not been identified as an expert, and the only reason he could -- he could testify to it is because he has this business valuation expertise which was placed on the record in front of the jury and it's not a simple math problem.

The court clarified that plaintiff could use the $12.8 million business valuation and apply simple math to it, but precluded plaintiff from engaging in an independent business valuation.

Consistent with the court's ruling, when plaintiff's testimony resumed, he said that 44% of $12.8 million is $5.632 million, which represents the value of BAS. But because plaintiff

maintained he owned 49.95% of BAS, he said his individual share amounts to $2.813 million (nearly half of $5.632 million). Later, regarding a different form of damages, plaintiff testified his employment contract provided he would acquire equity in new transactions, which plaintiff opined included the Aldara project. Plaintiff testified that Minkara specifically informed him that plaintiff earned 5% equity in the Aldara project, equating to $1.5 million. There was no objection to this testimony.

It is evident that defendant did not object to any of the now-challenged testimony set forth immediately above. While defendant did raise an objection concerning his personal valuation of CIG, its counsel ultimately acquiesced that plaintiff could perform "simple math" of multiplying BAS's (already admitted) 44% ratio to CIG's (already admitted) $12.8 valuation. That makes the issue unpreserved. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). We therefore must decline to address it, and see no reason to excuse defendant's failure to raise the issue below based on exceptional circumstances. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289-290, 293-294; 14 NW3d 472 (2023).

## IV. VERDICT FORM

Defendant next argues the trial court erred by implementing a four-question verdict form proffered by plaintiff. In its view, the form (1) misled the jury into believing that any purported breach of the letter agreement coupled with any alleged fraudulent concealment of a purported breach necessitated a finding in plaintiff's favor; and (2) omitted the critical question of when any purported fraudulent concealment occurred or when plaintiff became aware of a possible claim against defendant. Yet, defendant did not raise these objections in opposition to the four-question verdict form. That renders this challenge unpreserved for our review, and we again decline to exercise our discretion to set aside defendant's failure to raise the issue below. *Id*.

## V. AGAINST THE GREAT WEIGHT OF EVIDENCE

We next consider whether defendant is entitled to a new trial because many of the jury's determinations are against the great weight of evidence. They are not.

A new trial is warranted when the overwhelming weight of the evidence favors the losing party. *Guerrero v Smith*, 280 Mich App 647, 666; 761 NW2d 723 (2008). Conversely, the jury's verdict is not to be set aside if there is competent evidence to support it. *Wiley v Henry Ford Cottage Hosp*, 257 Mich App 488, 498; 668 NW2d 402 (2003). This Court reviews a trial court's determination whether the overwhelming weight of the evidence favors the losing party for an abuse of discretion. *Shuler v Mich Physicians Mut Liability Co*, 260 Mich App 492, 518; 679 NW2d 106 (2004). A court abuses its discretion when it selects an outcome falling outside the range of reasonable and principled outcomes. *Wolfenbarger v Wright*, 336 Mich App 1, 14; 969 NW2d 518 (2021).

## A. BREACH OF CONTRACT

We begin with defendant's contentions that the jury's finding that there were valid oral amendments to the initial letter agreement and a subsequent breach was against the great weight of evidence.

Defendant's oral-amendment issue is not properly before us because it did not make this particular argument in its motion for a new trial. See *Barnes v 21st Century Premier Ins Co*, 334 Mich App 531, 552; 965 NW2d 121 (2020) ("[A] motion for a new trial [i]s required to preserve an appellate argument that a jury's verdict was against the great weight of evidence."). This issue is thus unpreserved for our review, and we see no reason to exercise our discretion and consider it nonetheless. See *Tolas Oil & Gas*, 347 Mich App at 293-294.

In asserting the lack of evidence of breach, defendant maintains there is nothing showing that plaintiff met the revenue hurdles required to obtain an equity interest in BAS. We cannot agree. Evidence indicating that plaintiff did meet his targets include (1) his testimony that Minkara assured him at the annual reviews that he had earned equity; (2) no performance reviews explicitly mentioned plaintiff failing to meet any hurdle rate or failing to accrue equity; (3) the performance reviews had numerous references to revenue targets being met; and (4) CIG created a spreadsheet showing plaintiff earning 3.33% equity every year. To be sure, defendant offered significant evidence to the contrary. Minkara, for example, forcefully denied making such assurances to plaintiff during the annual performance reviews and asserted the spreadsheet was a hypothetical model. And defendant never issued plaintiff any K-1 forms, indicating he was either a shareholder or a member. But in our review, these differing views on the facts results in a credibility determination to be resolved by the jury. *Guerrero*, 280 Mich App at 669 ("It is the jury's responsibility to determine the credibility and weight of the trial testimony.").

Although there was opposing evidence presented, it cannot be said that the trial court abused its discretion in concluding that the overwhelming weight of the evidence did not favor defendant.

## B. FRAUDULENT CONCEALMENT

Defendant's next great-weight-of-the-evidence challenge concerns the jury's finding that defendant engaged in fraudulent concealment.

Whether defendant engaged in fraudulent concealment was relevant to determine if plaintiff's claim for damages for breach of the initial letter agreement related to the 10% equity in BAS was time-barred under MCL 600.5807(9) because that claim arose in 2011 and plaintiff filed his complaint in 2022. The trial court submitted to the jury for a factual determination whether defendant engaged in fraudulent concealment, the legal effect of which means plaintiff's claim was tolled under MCL 600.5855. It provides for tolling when a person "fraudulently conceals the existence of the claim . . . from the knowledge of the person entitled to sue on the claim," and entitles a plaintiff to bring an action within two years after a plaintiff "discovers, or should have discovered, the existence of the claim. . . ." MCL 600.5855. A finding of fraudulent concealment requires affirmative fraudulent acts designed to prevent inquiry, prevent investigation, or hinder acquisition of information regarding a cause of action. See *Reserve at Heritage Village Ass'n v Warren Fin Acquisition, LLC*, 305 Mich App 92, 122-123; 850 NW2d 649 (2014).

Defendant maintains that the jury's fraudulent concealment finding is against the great weight of evidence because it was "undisputed" that: (1) as of 2010, defendant had not recognized or treated plaintiff as an equity interest holder in BAS, and (2) plaintiff was explicitly told at his first three annual performance reviews that he had not met the conditions to receive equity. That

is not the record we reviewed. While Minkara stated that he informed plaintiff that he failed to earn equity at these performance reviews, plaintiff testified that he was in fact told the *opposite* at his annual reviews. During his testimony, plaintiff said that Minkara told him that he had earned equity those first three years, resulting in a 10% interest in BAS (in addition to 3.33% in equity each year thereafter). Other pertinent evidence included testimony concerning Minkara taking steps to hide EAS's financials and plaintiff's first three annual performance reviews themselves, which, although they failed to explicitly mention anything about meeting any "revenue hurdle rates," nonetheless showed that plaintiff had favorable results with respect to revenue targets. The 2008 review noted that plaintiff's goals and objectives for 2007 were "Timely, well done"; the 2009 review noted that plaintiff "Exceeded Expectations" for increasing consulting business in 2008; and the 2010 review—addressing performance in 2009—recognized that plaintiff's department "experienced growth" and that the "consulting income was healthy," with Minkara noting that plaintiff exceeded the $250,000 revenue target for consulting. If defendant truly held the position that plaintiff failed to meet the revenue hurdle rates, then the jury could conclude that these statements and representations by Minkara were affirmative fraudulent acts designed to prevent inquiry, prevent investigation, or hinder acquisition of information regarding a potential cause of action. As a result, defendant has failed to show how the great weight of evidence favors it on this issue.

Defendant next relies on the principle that "[i]f there is a known cause of action[,] there can be no fraudulent concealment which will interfere with the operation of the statute [of limitations]." *Id*. (quotation marks and citation omitted). It contends that because there is no indicia of plaintiff's alleged ownership interest as of 2010, plaintiff was put on notice by then that he had a potential claim for breach of contract, which is contrary to his claim that he only learned of a possible cause of action in 2021. While the lack of issued K-1 forms and capital calls (asking its owners for monetary contributions) arguably show that defendant did not consider plaintiff as having any recognized interest in CIG (or BAS), that evidence is not so overwhelming related to plaintiff's perceptions as to require a new trial.

## C. $3 MILLION DAMAGES AWARD

Finally, defendant takes issue with the evidence supporting the jury's $3 million award.

Defendant first contends that plaintiff's reliance on CIG's gross and net revenues inadequately calculate the value of plaintiff's interest in BAS. But it offers this position without any evidentiary or authoritative support, rendering it nugatory. See *Seifeddine v Jaber*, 327 Mich App 514, 519-520; 934 NW2d 64 (2019) ("A party may not simply announce a position and leave it to this Court to make the party's arguments and search for authority to support the party's position.").

Next, defendant asserts that it was improper to rely on the gross revenue of EAS in calculating any damages, contending that plaintiff's position that all of EAS's revenues should have been allocated to BAS is without evidentiary support. But plaintiff did support his position. All of EAS's revenue was billed under the agreement it had with Aldara. And that agreement provided that EAS was providing "consulting services." Plaintiff's case was premised on the view that defendant was hiding or sheltering consulting income by allocating it to EAS instead of BAS,

which typically performed "consulting services" for CIG. Accordingly, the amount of revenue EAS had was pertinent for that analysis.

Nor do we find persuasive defendant's position that any reliance on the $12.8 million valuation plaintiff saw is irrelevant because there was no context to show that it was relevant for determining plaintiff's interest in BAS. Defendant relies on the testimony of Minkara, in which he stated that the $12.8 million valuation was based on a possible or hypothetical future and not on reality. To the extent there is a lack of "context" for the third-party valuation, defendant could have cured that by providing documentation of the valuation performed by that third party. In any event, the jury was not obligated to believe Minkara. See *Kelly v Builders Square, Inc*, 465 Mich 29, 39; 632 NW2d 912 (2001) ("[T]he jury is free to credit or discredit any testimony.").

In sum, plaintiff had sought nearly $6 million in damages, and the jury awarded $3 million. The verdict was not against the great weight of evidence, and the trial court did not abuse its discretion by denying defendant motion for a new trial on this basis.

## VI. CONCLUSION

For these reasons, we affirm the trial court's judgment. Plaintiff, as the prevailing party, may tax costs pursuant to MCR 7.219(A).

/s/ Adrienne N. Young
/s/ Stephen L. Borrello
/s/ Christopher M. Trebilcock